**EFiled: May 11 2016 08:00AM EDT**
**Transaction ID 58988315**
**Case No. 9322-VCL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE: APPRAISAL OF DELL INC.

)
)
)

C.A. No. 9322-VCL

## OPINION

Date Submitted: March 18, 2016
Date Decided: May 11, 2016

Stuart M. Grant, Michael J. Barry, Christine M. Mackintosh, GRANT & EISENHOFER P.A., Wilmington, Delaware; *Counsel for Petitioners*.

Gregory P. Williams, John D. Hendershot, Susan M. Hannigan, Andrew J. Peach, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John L. Latham, Susan E. Hurd, ALSTON & BIRD LLP, Atlanta, Georgia; Gidon M. Caine, ALSTON & BIRD LLP, East Palo Alto, California; Charles W. Cox, ALSTON & BIRD LLP, Los Angeles, California; *Counsel for Respondent*.

**LASTER, Vice Chancellor.**

Respondent Dell Inc. completed a merger (the "Merger") that gave rise to appraisal rights. A stockholder only can pursue an appraisal if the stockholder "neither voted in favor of the merger . . . nor consented thereto in writing." 8 *Del. C.* § 262(a) (the "Dissenter Requirement"). The appraisal statute defines the term "stockholder" as "a holder of record of stock in a corporation." *Id.* (the "Record Holder Requirement").

Fourteen of the appraisal petitioners are mutual funds sponsored by T. Rowe Price & Associates, Inc. ("T. Rowe") or institutions that relied on T. Rowe to direct the voting of their shares (collectively, the "T. Rowe Petitioners"). The T. Rowe Petitioners were not holders of record. They held their shares through a custodial bank, State Street Bank & Trust Company ("State Street").[1] For purposes of Delaware law, State Street was not a holder of record either. It was a participant member of the Depository Trust Company ("DTC"). As described in a related opinion, DTC is a depository institution formed in 1973 in response to the federal policy of share immobilization. *See In re Appraisal of Dell Inc.* (*Dell Ownership)*, 2015 WL 4313206, at *1-2, 4-7 (Del. Ch. July 13, 2015).

DTC held the T. Rowe Petitioners' shares in the name of its nominee, Cede & Co. For purposes of Delaware law, Cede was the holder of record. As such, Cede had the legal right under Delaware law to vote the shares and demand appraisal.

---

[1] Some of the T. Rowe Petitioners used other custodians, but the parties have treated this variation as immaterial and briefed the matter as if State Street were the sole custodian. Their shared premise simplifies one aspect of a complex situation, so this decision gratefully adopts it.

But Delaware law formed only part of a Byzantine and path-dependent system by which stockholders voted on the Merger. Federal law, the Uniform Commercial Code, stock exchange listing standards, and private contracts combined to create an overarching superstructure of requirements and practices. The resultant legal web constrained Cede to vote the T. Rowe Petitioners' shares as T. Rowe directed.

Cede fulfilled this obligation through a daisy chain of authorizations. First, DTC transferred Cede's state law voting authority to the DTC participants by executing an omnibus proxy in their favor. At that point, voting authority for the T. Rowe Petitioners' shares rested with State Street.

Next, State Street outsourced to Broadridge Financial Solutions, Inc. the task of collecting and implementing voting instructions from its many account holders, including the T. Rowe Petitioners. To carry out that task, State Street gave Broadridge a power of attorney which authorized Broadridge to execute proxies on State Street's behalf. At that point, voting authority for the T. Rowe Petitioners' shares rested with Broadridge.

To fulfill its contractual obligations to State Street, Broadridge communicated with State Street's account holders and obtained voting instructions by mail, by telephone, or over the internet. With T. Rowe, the process involved an additional party: Institutional Shareholder Services Inc. ("ISS"). To facilitate the submission of voting instructions in connection with numerous meetings of stockholders each year, T. Rowe has retained ISS to notify T. Rowe about upcoming votes, provide voting recommendations, collect T. Rowe's voting instructions, and convey them to Broadridge. To make the voting process more efficient, T. Rowe has a computerized system that

automatically generates default voting instructions and provides them to ISS. The default voting instruction for a management-supported merger is to vote in favor.

Although T. Rowe opposed the Merger, its voting system generated instructions to vote the T. Rowe Petitioners' shares in favor of it. ISS received those instructions and transmitted them to Broadridge. Broadridge received those instructions and included them when voting the shares that Cede owned. When Broadridge submitted its client proxies, the proxies voted the T. Rowe Petitioners' shares "FOR" the Merger. Through Broadridge, Cede voted the T. Rowe Petitioners' shares in favor of the Merger.

Because the holder of record did not dissent as to the shares for which the T. Rowe Petitioners now seek appraisal, the Dissenter Requirement is not met. The T. Rowe Petitioners' shares do not qualify for appraisal. Judgment is entered against them. The T. Rowe Petitioners remain entitled to the merger consideration without any award of interest.

## I.  FACTUAL BACKGROUND

Dell originally moved for entry of summary judgment against the T. Rowe Petitioners because of their failure to satisfy the Dissenter Requirement. The parties agreed to defer briefing until after trial, and the materials that they deemed relevant were introduced into the trial record. The factual findings in this decision are drawn from the trial record.

### A.  The Merger

On February 5, 2013, Dell's board of directors (the "Board") approved an agreement and plan of merger (the "Merger Agreement") between Dell and three

counterparties: Denali Holding Inc., Denali Intermediate Inc., and Denali Acquiror Inc. Dell's counterparties under the Merger Agreement were affiliates of Dell's eponymous founder, Michael Dell, and Silver Lake Management LLC (the "Buyout Group"). The Merger Agreement contemplated that each share of common stock of Dell not held by a member of the Buyout Group would be converted into the right to receive $13.75 in cash. The Merger therefore gave rise to appraisal rights. *See* 8 *Del. C.* § 262(b).

Under Section 251(c) of the Delaware General Corporation Law (the "DGCL"), a merger agreement "shall be submitted to the stockholders of each constituent corporation at an annual or special meeting for the purpose of acting on the agreement." *Id.* § 251(c). The Board scheduled a meeting of stockholders for July 18, 2013 (the "July Meeting"). The Board set a record date of June 3 for the meeting.

On May 31, 2013, Dell filed its definitive proxy statement for the July Meeting (including amendments, the "Proxy Statement"). The Proxy Statement announced the meeting date and the record date, solicited proxies from Dell's stockholders, and asked them to vote "FOR" the Merger.

## B.      The T. Rowe Petitioners' Shares

The T. Rowe Petitioners had invested in Dell common stock.[2] They did not, however, hold legal title to any shares. They were beneficial owners who held through State Street.

---

[2] In the order that they appear on the verified list required by Section 262(f) of the DGCL, the T. Rowe Petitioners are (i) T. Rowe Price Equity Income Fund, Inc. (Verified

4

State Street did not hold legal title either. Legal title rested with Cede, the nominee of DTC. As discussed in a related opinion, DTC's role in the ownership structure of publicly traded domestic corporations stems from the federal policy of share immobilization, adopted in response to a paperwork crisis on Wall Street during the late 1960s and early 1970s. *See Dell Ownership*, 2015 WL 4313206, at *1-2, 4-7. To achieve share immobilization, the Securities and Exchange Commission placed a new entity—the depository institution—at the bottom of the ownership chain. DTC emerged as the only domestic depository. Today, over 800 custodial banks and brokers are participating members of DTC and maintain accounts with that institution.

DTC primarily holds shares on behalf of its participants in fungible bulk, meaning that all of the shares are issued in the name of Cede "without any subdivision into separate accounts of the custodian's customers." Marcel Kahan & Edward Rock, *The*

---

List No. 1); (ii) T. Rowe Price Science and Technology Fund, Inc. (Verified List No. 2); (iii) John Hancock Variable Insurance Trust - Equity Income Trust (Verified List No. 5); (iv) John Hancock Funds II - Equity Income Fund (Verified List No. 7); (v) T. Rowe Price Equity Income Trust, a sub-trust of T. Rowe Price Institutional Common Trust Fund (Verified List No. 9); (vi) T. Rowe Price Institutional Equity Funds, Inc., on behalf of T. Rowe Price Institutional Large Cap Value Fund (Verified List No. 10); (vii) John Hancock Funds II - Science & Technology Fund (Verified List Nos. 13 & 39); (viii) T. Rowe Price Equity Income Series, Inc., on behalf of T. Rowe Price Equity Income Portfolio (Verified List No. 15); (ix) John Hancock Variable Insurance Trust - Science & Technology Trust (Verified List No. 18); (x) T. Rowe Price U.S. Equities Trust (Verified List Nos. 23 & 24); (xi) Prudential Retirement Insurance and Annuity Co., on behalf of Separate Account SA-5T2 (Verified List No. 26); (xii) John Hancock Funds II - Spectrum Income Fund (Verified List No. 42); (xiii) Tyco International Retirement Savings and Investment Plan Master Trust (Verified List No. 43); and (xiv) The Bureau of National Affairs, Inc. (Verified List No. 45). This list omits the T. Rowe Petitioners whose claims to appraisal were addressed in the *Dell Ownership* decision.

*Hanging Chads of Corporate Voting*, 96 Geo. L.J. 1227, 1239 (2008). Through a Fast Automated Securities Transfer account (the "FAST Account"), DTC tracks the number of shares that each participant holds using an electronic book entry system.

When the Board approved the Merger, the shares of Dell common stock that State Street held at DTC on behalf of the T. Rowe Petitioners were part of the FAST Account. Beginning on July 12, 2013, however, T. Rowe caused Cede to send letters demanding appraisal on behalf of the T. Rowe Petitioners. Cede sent a separate demand letter for each T. Rowe Petitioner, and each demand letter made clear that Cede was seeking appraisal on behalf of a specified block of shares owned by a client of one of its participants. In standardized language, each demand stated that Cede was the record holder of shares of Dell common stock and was "informed by its Participant" that a specified number of shares was "beneficially owned by" an identified beneficial owner, characterized as a "customer of Participant." *E.g.*, JX 495 at 1. Each demand concluded, "[i]n accordance with instructions received from Participant on behalf of its customer, we hereby assert appraisal rights with respect to the Shares." *E.g.*, *id.*

For reasons explained in the *Dell Ownership* decision, when the T. Rowe Petitioners caused Cede to demand appraisal, DTC removed the shares covered by the demand from the FAST Account and requested paper certificates from Dell's transfer agent. *See* 2015 WL 4313206, at *2-3. From that point on, the shares that State Street held as custodian were maintained in certificated form in DTC's vault. One can infer that State Street had contracted with DTC to hold paper stock certificates, thereby avoiding the problem of re-titled certificates which the *Dell Ownership* decision addressed.

6

The following illustration depicts the manner in which the T. Rowe Petitioners held their shares and the multiple levels of ownership involved. The figure identifying Cede's ownership encompasses both shares held in fungible bulk and shares that are certificated in Cede's name.



## C. T. Rowe's Relationship With ISS

As one of the largest institutional investors in the United States, T. Rowe is called upon to submit voting instructions at a large number of stockholder meetings. To facilitate the submission of voting instructions, T. Rowe has adopted a set of default voting policies. T. Rowe also has entered into an agreement with ISS under which ISS provides a range of voting-related services (the "ISS Master Agreement").

As defined in an attachment to the ISS Master Agreement, the services provided by ISS included an "administrative portion" that encompasses "vote execution" and "record keeping and reporting services." JX 8 at 7.

> Under vote execution, ISS tracks User/Subscriber's holdings by account to ensure votes are recorded on time and casts votes based on User/Subscriber's guidelines.
>
> For record keeping and reporting, ISS records the meeting name, CUSIP, meeting date, shares voted, proxy proposals, management recommendation, and vote cast. ISS also provides standard reports for each company voted, all votes for a single account, and other specialized reports.

*Id.* Under the heading "**PERFORMANCE STANDARDS**," the attachment stated: "Subscriber/User requires that at least ninety-nine (99%) of all meetings be voted and voted as instructed." *Id.* at 8.

For the period beginning January 1, 2013, T. Rowe and ISS clarified their contractual relationship by entering into an addendum to the ISS Master Agreement (the "Addendum") and a supplemental service level agreement (the "Supplemental Agreement"). The Addendum elaborated on how ISS would maintain and provide T. Rowe with access to records documenting how its shares were voted. It stated that ISS would provide "[a] web-based search and presentation mechanism for disclosure of any archived proxy votes cast on behalf of the Subscriber by ISS for the mutual funds and accounts listed below. Through a link on the Subscriber's web site, users will be able to seamlessly access vote records." JX 246 at 3.

The Supplemental Agreement specified the manner in which ISS would notify T. Rowe about upcoming meetings, provide voting recommendations, and carry out T.

8

Rowe's voting instructions. A paragraph entitled "Delivery of Research, Recommendations and Voting Services" stated:

> ISS will review Subscriber's holdings file and/or the ballots received for the Subscriber and match the holdings and/or the ballots against the upcoming shareholders meeting list maintained by ISS. In the event of a match, an entry will be created on the electronic web-based delivery platform regarding the meeting.
>
> For each match for Subscriber's common equity holdings, ISS will prepare a research report and make a vote recommendation with respect to each item to be voted on the shareholders meeting. The research report and vote recommendations will be prepared in accordance with Subscriber's custom voting policy as provided by Subscriber to ISS. . . . Research and recommendations will be presented via ISS' electronic web-based delivery system.

*Id.* at 9. The "web-based delivery platform" was part of a computerized voting system maintained by ISS called Proxy Exchange (the "ISS Voting System").

The Supplemental Agreement elaborated on ISS's obligation to implement T. Rowe's voting instructions accurately. A provision titled "Voting Services" stated:

> ISS must accurately vote [REDACTED] of Subscriber's ballots. If ISS fails to meet this target due to an ISS error (including voting ballots contrary to Subscribers [sic] instructions received in good order), then ISS shall provide the Subscriber with a service credit of [REDACTED] of ballot fees.

*Id.* at 10.

Under these agreements, when ISS learned that an issuer had scheduled a meeting of stockholders, the ISS Voting System would notify T. Rowe by generating a communication called a meeting record. T. Rowe personnel would view the meeting record through T. Rowe's Proxy Recommendation System (the "T. Rowe Voting System"). The T. Rowe Voting System would pre-populate the meeting record with

voting instructions that matched T. Rowe's standard voting policies. When T. Rowe received a meeting record, the T. Rowe Voting System would send an email automatically to the portfolio managers of the T. Rowe funds who were invested in that issuer so that they could review the meeting record and determine whether to depart from T. Rowe's standard voting policies. To vote, a T. Rowe portfolio manager could either leave the pre-populated voting instructions in place or submit different instructions. Once finalized, the voting instructions would be sent to ISS.

**D.     T. Rowe Provides Voting Instructions For The July Meeting.**

For the July Meeting, the ISS Voting System generated a meeting record on July 9, 2013 (the "July Meeting Record"). It identified three agenda items. Item 1 was the approval of the Merger Agreement. Item 2 was an advisory vote on golden parachute compensation payable in connection with the Merger. Item 3 was a proposal giving Dell authority to adjourn the July Meeting. For a transaction that is supported by management, the T. Rowe default voting position was to vote "FOR" the transaction and "FOR" the authority to adjourn. The default voting position was to vote "AGAINST" an advisory vote on golden parachute compensation.

The T. Rowe Voting System pre-populated the July Meeting Record with T. Rowe's default voting positions and sent an email to all of the T. Rowe portfolio managers who held Dell stock in actively managed accounts. Six of the portfolio managers decided to vote against the Merger. They communicated their determinations to a T. Rowe Vice President and Corporate Governance Specialist.

On July 16, 2013, the Corporate Governance Specialist logged into the T. Rowe Voting System and changed the voting instructions for the first and third items in the July Meeting Record to "AGAINST." As a result, the July Meeting Record contemplated T. Rowe voting against all three items. The T. Rowe Voting System sent the specialist an email confirming those instructions.

That same day, relying on the voting instructions entered into the July Meeting Record by the Corporate Governance Specialist, a T. Rowe Business Analyst entered the "AGAINST" instructions into the ISS Voting System. The analyst clicked "submit" on the web-based portal, transmitting those voting instructions to ISS.

Also that same day, a T. Rowe Price Assistant Vice President and Senior Manager emailed ISS to confirm that ISS had received the instructions to vote "AGAINST" all three proposals. ISS confirmed receipt of the instructions.

E.      **Dell Pushes Off The July Meeting Three Times.**

On July 18, 2013, Dell convened the July Meeting for the sole purpose of adjourning it until July 24. ISS updated the date of the meeting, but did not send out a new meeting record for the adjourned meeting. The T. Rowe Corporate Governance Specialist nevertheless confirmed that T. Rowe's instructions to vote "AGAINST" remained operative in both the T. Rowe Voting System and the ISS Voting System.

On July 23, 2013, the Buyout Group delivered a revised proposal that increased the merger consideration to $13.75. Dell rejected the proposal, but adjourned the stockholder meeting until August 2. ISS updated the date of the meeting, but did not send out a new meeting record for the adjourned meeting. The T. Rowe Corporate Governance

11

Specialist reconfirmed that T. Rowe's instructions to vote "AGAINST" remained operative in both the T. Rowe Voting System and the ISS Voting System.

On July 31, 2013, the Buyout Group proposed a one-time special cash dividend that effectively increased the merger consideration to the final figure of $13.88 per share. On August 2, Dell accepted the revised proposal. Also on August 2, Dell convened the adjourned meeting for the sole purpose of adjourning it again until September 12 (the "September Meeting"). Dell set a new record date of August 13 for the September Meeting.

On August 12, 2013, ISS updated the date of the meeting to September 12, but the ISS Voting System did not generate a new meeting record. The T. Rowe Corporate Governance Specialist confirmed for a third time that T. Rowe's instructions to vote "AGAINST" all three proposals remained operative in both the T. Rowe Voting System and the ISS Voting System.

**F.     The Voting Mix-Up For The September Meeting**

On September 4, 2013, the ISS Voting System generated a new meeting record for the re-scheduled meeting (the "September Meeting Record"). The T. Rowe Voting System showed both the July Meeting Record and the September Meeting Record. In the ISS Voting System, however, the September Meeting Record replaced the July Meeting Record. This had the effect of deleting the voting instructions that had been entered in the ISS Voting System.

The T. Rowe Voting System automatically pre-populated the September Meeting Record with the default voting instructions called for by T. Rowe's voting policies. As a

12

result, the T. Rowe Voting System populated the September Meeting Record with instructions to vote "FOR" the Merger, "AGAINST" the advisory resolution on golden parachutes, and "FOR" authority to adjourn the meeting.

No one from T. Rowe's proxy team logged into the ISS Proxy System to check the status of T. Rowe's voting instructions. As part of the routine operation of the two systems, the default instructions in the September Meeting Record were conveyed automatically to ISS.

## G. Broadridge Votes The Shares.

Simply by providing instructions to ISS, the T. Rowe Petitioners had not yet voted their shares. Getting to the actual voting required three more steps: the transfer of the voting instructions from ISS to Broadridge, the transfer of voting authority from Cede to Broadridge, and the execution and delivery by Broadridge of a client proxy that voted the shares over which it had received voting authority in accordance with the voting instructions it had received.

### 1. The Sources Of Broadridge's Authority

Under Delaware law, the legal authority to vote at a meeting of stockholders rests with the stockholders of record at the time of the meeting, and for that purpose, the stock ledger constitutes "the only evidence as to who are the stockholders entitled . . . to vote in person or by proxy at any meeting of stockholders." 8 *Del. C.* § 219(c). The stock ledger "is a compilation of the transfers by and to each individual stockholder, with each transaction separately posted to separately maintained stockholder accounts." 2 David A. Drexler et al., *Delaware Corporation Law and Practice* § 25.03, at 25-7 (2015).

13

Because shares are freely alienable by default, the identity of a corporation's stockholder base is typically in flux—and for a public corporation constantly so. It is therefore necessary to define a specific population of stockholders who are entitled to receive notice of a meeting of stockholders and vote at the meeting. The DGCL addresses this need by empowering a board of directors to set either a single record date for both purposes, or to pick two separate record dates, one for notice and another for voting. *See* 8 *Del. C.* § 213. Based on the record date that will control the exercise of voting rights, the DGCL contemplates that "[t]he officer who has charge of the stock ledger of a corporation shall prepare and make . . . a complete list of the stockholders entitled to vote at the meeting." *Id.* § 219(a). The resulting list identifies the stockholders of record on the selected date, "arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder." *Id.* It thus converts the transactions on the stock ledger into a list of owners with legal authority to exercise voting rights at the meeting.

Dell outsourced the obligation to maintain its stock ledger and generate a stock list to its transfer agent, American Stock Transfer & Trust Company, LLC ("American"). Using the record date of August 13, 2013, American generated a list of stockholders showing Dell's holders of record under state law for purposes of the September Meeting. The stock list identified Cede as the holder of record for 1,535,558,891 shares, with 240,996,342 shares certificated in its own name and 1,294,562,549 in the FAST Account. Within the 240,996,342 shares held in Cede's own name were the T. Rowe Petitioners'

14

shares, which had been certificated when the T. Rowe Petitioners caused Cede to demand appraisal.

Under the federal regime that created the depository system, DTC is not a record holder and cannot simply vote the shares held in Cede's name. The record holders for purposes of federal law are the DTC participants. *See* 17 C.F.R. § 240.14c–1(i). In this case, State Street was the DTC participant and record holder for purposes of federal law. To transfer its state-law voting rights to the federal-law record holders, DTC executed an omnibus proxy in favor of its participants. *See generally Kurz v. Holbrook*, 989 A.2d 140, 161 (Del. Ch. 2010), *aff'd in part, rev'd in part on other grounds sub nom. Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377 (Del. 2010).

The voting rights handoff did not stop there. When a DTC participant holds shares as a fiduciary for its clients, as State Street did, then the participant is obligated to provide its clients with proxy cards or voting instruction forms and carry out any instructions it receives.[3] That task is an administrative headache, and many participants have outsourced it.

---

[3] *See* 17 C.F.R. § 240.14b-1 (brokers); *id.* § 14b-2 (banks); Kahan & Rock, *supra*, at 1247; John C. Wilcox, John J. Purcell III, & Hye-Won Choi, *"Street Name" Registration & The Proxy Solicitation Process*, *in* A Practical Guide to SEC Proxy and Compensation Rules § 10.03[A], at 10-9,12-8 to 12-10 (Amy L. Goodman et al. eds., 4th ed. 2007 & 2008 Supp.) [hereinafter *Street Name*]. Stock exchange rules generally prohibit a custodian from voting client shares on a non-routine matter except in accordance with voting instructions from the client. *See* NASDAQ Stock Market Rule 2251(d); New York Stock Exchange Rules 450 & 452.

> For many years, banks and brokers maintained their own proxy departments to handle the back-office administrative processes of distributing proxy materials and tabulating voting instructions from their clients. Today, however, the overwhelming majority have eliminated their proxy departments and subcontracted these processes out to the Investor Communication Solutions Division of [Broadridge] . . . , which now provides these services to most banks and brokers.

*Street Name*, *supra*, § 10.03[A][3], at 10-14.

State Street is one of the custodians that has outsourced a variety of voting-related functions to Broadridge. In this case, a services agreement between State Street and Broadridge provided that "Broadridge shall fulfill all annual meeting, proxy voting (contested and uncontested) and consent gathering communications requested by a corporate or other issuer (a 'Registrant') on behalf of [State Street]." JX 43 at 32. They agreed that "Broadridge does not transmit signed proxies to beneficial shareholders or member organizations but uses a standard voting instruction form (a 'Voting Information Instruction Form') in lieu thereof." *Id.* at 33.

As part of the contractual arrangement, Broadridge committed to provide State Street with the following recordkeeping services:

(1) In connection with each meeting of a Registrants [sic] with respect to which Broadridge provides Services, Broadridge keeps and maintains for a period of seven (7) years from the date of such meeting, or such longer period as shall be reasonably requested in writing by [State Street]:

    (a) Voting Instruction Forms that are returned with the beneficial shareholders' voting instructions;

    (b) a record of all voting instructions received from beneficial shareholders verbally or electronically;

    (c) copies of all multiple client proxies sent to Registrants; and

(d) copies of [State Street] voting confirmations which inform [State Street] of all the voting results for each proxy job processed by Broadridge on behalf of [State Street].

(2) Broadridge shall, during reasonable business hours, make available to [State Street] the above records during such periods.

*Id.* at 35.

State Street granted Broadridge a power of attorney that gave Broadridge the authority to perform the contracted-for services. *See id.* at 37. The power of attorney in effect for purposes of the September Meeting appointed three Broadridge representatives

individually, with full power of substitution, the undersigned's true and lawful attorney in the undersigned's name, place and stead for the sole purpose of executing proxies issued by any and all corporate or other issuers with respect to any and all of the securities of any such corporate or other issuer registered in the name of the undersigned or its nominee and owned by the undersigned, or registered in the name of the undersigned or its nominee and beneficially owned by clients of the undersigned . . . .

*Id.* at 45. The power of attorney limited this broad grant of authority to executing proxies "only in accordance with the voting instructions of the undersigned or the beneficial owners of any such securities indicated on the returned proxies or voting instruction forms," unless stock exchange rules or SEC rules allowed Broadridge to vote without instructions from the beneficial owners. *Id.*

Through these contractual arrangements, Broadridge ended up with the legal authority to vote the shares held of record by Cede on behalf of the T. Rowe Petitioners for which State Street was custodian. The omnibus proxy transferred to State Street the authority that the DGCL imbued in DTC, and State Street had a standing arrangement transferring the right to exercise that authority to Broadridge under the power of attorney.

In this case, the T. Rowe Petitioners had demanded appraisal, which caused DTC to certificate their shares. State Street therefore had to take the additional step of manually entering the T. Rowe Petitioners' ownership positions into Broadridge's system. When this occurred, Broadridge's computer system generated an internal control number for each position. State Street provided the control numbers for twelve of the T. Rowe Petitioners to ISS so that ISS could submit voting instructions for those positions to Broadridge. State Street did not provide a control number for the John Hancock Funds II – Science & Technology Fund or the Bureau of National Affairs, Inc.

## 2. Broadridge Receives Instructions And Votes The Shares.

On September 9, 2013, ISS transmitted to Broadridge the voting instructions for the T. Rowe Petitioners' positions as they appeared in the ISS Voting System. Those voting instructions were found in the September Meeting Record, matched T. Rowe's default voting policies, and called for voting "FOR" the Merger, "AGAINST" the advisory vote on golden parachute compensation, and "FOR" authority to adjourn the meeting.

In the next step in the voting process, Broadridge delivered a series of "Broadridge Client Proxies" to Dell's proxy solicitor. The first proxy was dated September 10, 2013, and revoked all prior proxies. Broadridge delivered supplemental client proxies as it received additional voting instructions from its broker and custodian clients. Each client proxy was issued "pursuant to powers of attorney executed by each listed brokerage firm or nominee which are in full force and effect as of the date hereof" and "on file with the offices of Broadridge." JX 694 at 3. Through its client proxy cards, Broadridge voted

18

each of the positions held by the T. Rowe Petitioners "FNF," meaning "FOR" the Merger, "AGAINST" the advisory resolution on golden parachute compensation, and "FOR" authority to adjourn the meeting. Each Broadridge Client Proxy disclosed aggregate votes by client. None of the Broadridge Client Proxies broke out the shares by accounts or beneficial owners.

The following illustration depicts the flow of voting power and instructions.



In this case, the record establishes how Cede voted the T. Rowe Petitioners' shares because the Broadridge internal control numbers serve as a unique identifier for each position held by a Broadridge client. Although Broadridge does not provide its control numbers to the issuer or the public, it does make them available upon request to its clients, such as State Street. The following table identifies the T. Rowe Petitioner, its unique Broadridge control number, its corresponding identification on the verified list of appraisal petitioners, and the number of shares voted in favor of the Merger.

| T. Rowe Petitioner | Control No. | Verified List No. | Shares |
|---|---|---|---|
| T. Rowe Price Equity Income Fund, Inc. | 902401246009 | 1 | 16,500,000 |
| T. Rowe Price Science and Technology Fund | 902401256207 | 2 | 7,045,780 |
| John Hancock Variable Insurance Trust - Equity Income Trust | 902401251707 | 5 | 1,271,400 |
| John Hancock Funds II - Equity Income Fund | 902401258409 | 7 | 1,010,600 |
| T. Rowe Price Equity Income Trust, a sub-trust of T. Rowe Price Institutional Common Trust Fund | 902401240403 | 9 | 965,100 |
| T. Rowe Price Institutional Equity Funds, Inc., on behalf of T. Rowe Price Institutional Large Cap Value Fund | 902401257303 | 10 | 954,800 |
| John Hancock Funds II - Science & Technology Fund | 344965119305 | 13 & 39 | 1,090,800 |
| T. Rowe Price Equity Series, Inc., on behalf of T. Rowe Price Equity Income Series, Inc. | 902401249307 | 15 | 685,800 |
| John Hancock Variable Insurance Trust Science & Technology Fund | 902401254005 | 18 | 458,900 |
| T. Rowe Price U.S. Equities Trust | 902401262001 | 23 & 24 | 552,100 |
| Prudential Retirement Insurance & Annuity Co., on behalf of Separate Account SA-5T2 | 902401281301 | 26 | 256,500 |
| John Hancock Funds II - Spectrum Income Fund | 902401261905 | 42 | 93,900 |
| Tyco International Retirement Savings & Investment Plan Master Trust | 902401276603 | 43 | 86,450 |
| The Bureau of National Affairs, Inc. | 344996356596 | 45 | 80,000 |

## H.    The Results Of The September Meeting

Each Broadridge Client Proxy appointed two Dell representatives to vote the shares represented by the proxy at the September Meeting in accordance with the instructions on the proxy. Dell's proxy solicitor aggregated all of the proxies, and the two Dell representatives voted them. IVS Associates, Inc., the inspector of the election,

counted the votes. IVS reported that stockholders present at the meeting had approved the

Merger, stating:

> At the close of business on August 13, 2013, the record date for determination of stockholders entitled to vote at the Meeting, there were issued and outstanding 1,758,001,669 shares of the Company's common stock, each share being entitled to one vote at the Meeting and representing all of the outstanding voting securities of the Company. . . .
>
> At the Meeting, the holders of 1,452,545,285 shares of the Company's common stock were represented in person or by proxy, constituting a quorum. . . .
>
> At the Meeting, the vote on a proposal to adopt the Agreement and Plan of Merger, dated as of February 5, 2013, as amended on August 2, 2013, by and among Denali Holding Inc., Denali Intermediate Inc., Denali Acquiror Inc. and the Company, as it may be further amended from time to time ("Proposal 1"), was as follows:

| For | Against | Abstain |
|---|---|---|
| 1,013,326,409 | 399,608,525 | 39,610,350 |

> Excluding the shares to be voted by the Affiliated Stockholders from the total shares voted For above, the vote on Proposal 1 was at least as follows:

| For | Against |
|---|---|
| 733,998,074 | 399,608,525 |

JX 695 at 1.

> The report that IVS prepared certified that Cede had voted as follows:

| For | Against | Abstain |
|---|---|---|
| 803,734,618 | 397,961,172 | 39,574,205 |

The votes recorded on Cede's behalf included the shares voted pursuant to the Broadridge Client Proxies, which implemented the instructions that T. Rowe provided to ISS and ISS conveyed to Broadridge.

## I.      Additional Evidence Of How The T. Rowe Petitioners Voted.

Eight of the T. Rowe Petitioners are mutual funds. Federal law requires that they file a Form N-PX disclosing how they voted their securities during the most recent twelve-month period ended June 30.[4]

In August 2014, the eight T. Rowe Petitioners filed their forms. ISS generated the forms using data pulled from the ISS Voting System. T. Rowe personnel checked the forms for accuracy and filed them. The forms stated that the eight T. Rowe Petitioners had voted "FOR" the Merger.

Because T. Rowe had opposed the Merger publicly, the disclosure that eight of the T. Rowe Petitioners had voted "FOR" the Merger generated inquiries. T. Rowe began to investigate what happened. On October 28, 2014, an ISS representative explained to T. Rowe personnel by email that it had provided Broadridge with instructions to vote the T. Rowe Petitioners' shares in favor of the Merger. The email stated:

> [T]he Dell Inc. meeting situation was very fluid during the July-Sept 2013 period and delayed several times. Ultimately, the proxy contest (and applicable ballots) was canceled and a special meeting was held for

---

[4] *See* 17 C.F.R. § 270.30b1-4 (imposing reporting requirement); *id.* § 274.129 (prescribing form of report). The record included Form N-PXs filed by eight of the T. Rowe Petitioners. They include: (i) T. Rowe Price Equity Income Fund, Inc. (Verified List No. 1; JX 830), (ii) T. Rowe Price Science and Technology Fund, Inc. (Verified List No. 2; JX 833), (iii) John Hancock Variable Insurance Trust - Equity Income Trust (Verified List No. 5; JX 827), (iv) John Hancock Funds II - Equity Income Fund (Verified List No. 7; JX 826), (v) T. Rowe Price Institutional Equity Funds, Inc., on behalf of T. Rowe Price Institutional Large Cap Value Fund (Verified List No. 10; JX 832), (vi) T. Rowe Price Equity Series, Inc. on behalf of T. Rowe Price Equity Income Portfolio (Verified List No. 15; JX 831), (vii) John Hancock Variable Insurance Trust - Science & Technology Trust (Verified List No. 18; JX 825), and (viii) John Hancock Funds II - Spectrum Income Fund (Verified List No. 42; JX 828).

shareholders to vote on the proposed merger. New ballots were issued for the Special meeting which were voted in-line with the [T. Rowe] Policy Recommendations; the majority of the ballots being voted 4-6 days prior to the meeting.

JX 838 at 1.

On November 4, 2014, after an extensive email exchange between ISS and T. Rowe, another ISS representative sent an email to two colleagues which explained that ISS had provided Broadridge with instructions to vote the T. Rowe Petitioners' shares in favor of the Merger. The email stated:

Today we had a call with [T. Rowe's] legal counsel regarding the Dell vote from last year. As you may recall, the meeting was originally coded as a Proxy Contest, but later changed to an EGM [extraordinary general meeting]. While the meeting was coded as a PC [proxy contest], [T. Rowe] voted AGAINST the merger agreement, but neglected to do so when the PC meeting was invalidated, and the EGM ballots were sent through.

While they are not placing any blame on ISS (this was an oversight on their part), they are trying to reconcile the information we are providing them, against the information they are receiving from Broadridge. To this point, they would like to review the portion of the [Consolidated Data Feed] that transmitted their vote information to Broadridge for the EGM. Meeting and audit trail details are below.

JX 843 at 10. An earlier email in the chain stated that at least "78 ballots were sent as FNF [*i.e.*, "FOR" the Merger, "AGAINST" the advisory executive compensation proposal, and "FOR" adjournment of the Meeting if necessary] to Broadridge on 2013-09-06 and 2009[sic]-09-09." JX 841 at 1. The email contained a list of control numbers,

nine of which match the control numbers that Broadridge assigned to the T. Rowe Petitioners.[5]

Also on November 4, 2014, a T. Rowe representative emailed State Street to determine how the shares it held on behalf of the T. Rowe Petitioners were voted. The email stated:

> I am requesting the vote report from Broadridge indicating how the following State Street accounts (T. Rowe Price funds) voted on the [Merger]. . . . We have spoken to Broadridge directly, who have confirmed that they keep audit records going back 7 years, so this information is available, but have been told that the request must come from State Street since you are their client. Therefore, please instruct Broadridge to send you this information in a report format so that we may receive it once you have it.

JX 844 at 5. The request included fourteen account numbers, six of which corresponded to accounts for the T. Rowe Petitioners. By email dated November 10, State Street sent T. Rowe a list identifying the fourteen account numbers with a corresponding ballot control number and reflecting that each position had been voted "FNF," *i.e.*, "FOR" the Merger,

---

[5] The corresponding T. Rowe Petitioners are (i) John Hancock Variable Insurance Trust - Equity Income Trust (Verified List No. 5), (ii) John Hancock Funds II - Equity Income Fund (Verified List No. 7), (iii) T. Rowe Price Equity Income Trust, a sub-trust of T. Rowe Price Institutional Common Trust Fund (Verified List No. 9), (iv) John Hancock Variable Insurance Trust - Science & Technology Trust (Verified List No. 18), (v) T. Rowe Price U.S. Equities Trust (Verified List Nos. 23 & 24), (vi) Prudential Retirement Insurance and Annuity Co., on behalf of Separate Account SA-5T2 (Verified List No. 26), (vii) John Hancock Funds II - Spectrum Income Fund (Verified List No. 42), (viii) Tyco International Retirement Savings and Investment Plan Master Trust (Verified List No. 43), and (ix) The Bureau of National Affairs, Inc. (Verified List No. 45).

24

"AGAINST" the executive compensation proposal, and "FOR" adjournment of the September Meeting.

Given this factual record, Dell has proven by a preponderance of the evidence that the T. Rowe Petitioners shares were voted "FOR" the Merger. Broadridge voted those shares in favor of the Merger through the Broadridge client proxies, which exercised the voting authority that Broadridge received from State Street through a power of attorney, and which State Street had received from Cede through the DTC omnibus proxy.

## II.     LEGAL ANALYSIS

Delaware cases uniformly place the burden of proof on the petitioner to demonstrate compliance with the requirements of the appraisal statute.[6] The Dissenter Requirement is one of those requirements. It therefore might seem intuitive that to satisfy the Dissenter Requirement, a petitioner would bear the burden of proving that Cede, as record holder, had not voted the shares for which appraisal was sought in favor of the merger giving rise to appraisal rights.

Two Delaware Supreme Court cases support that conclusion. *See Olivetti Underwood Corp. v. Jacques Coe & Co. (Olivetti II)*, 217 A.2d 683 (Del. 1966); *Reynolds Metals Co. v. Colonial Realty Corp. (Reynolds II)*, 190 A.2d 752 (Del. 1963).

---

[6] *See, e.g., Dirienzo v. Steel P'rs Hldgs. L.P.*, 2009 WL 4652944, at *7 (Del. Ch. Dec. 8, 2009); *Neal v. Ala. By-Products Corp.*, 1988 WL 105754, at *3 n.1 (Del. Ch. Oct. 11, 1988); *In re Engle v. Magnavox Co.*, 1976 WL 2449, at *1 (Del. Ch. Apr. 21, 1976); *In re Hilton Hotels Corp.*, 210 A.2d 185, 187 (Del. Ch. 1965), *aff'd sub nom. Carl M. Loeb, Rhoades & Co. v. Hilton Hotels Corp.*, 222 A.2d 789 (Del. 1966).

In three more recent cases, however, this court declined to require a petitioner to make this showing, which the decisions helpfully labeled a "share-tracing requirement."[7] All three cases involved situations where investors purchased shares in the open market after the record date for a merger for the purpose of pursuing appraisal. This practice is known colloquially as "appraisal arbitrage," so it is convenient to call them the "Appraisal Arbitrage Decisions."

Although the Delaware Supreme Court has not yet spoken on this issue, I believe that each of the Appraisal Arbitrage Decisions was decided correctly in light of the arguments that the parties advanced and the record they presented to the court. In none of the three cases was there evidence showing how the record holder voted the shares for which appraisal was sought. To the contrary, in each case, the parties agreed that it was impossible for either side—the investors or the corporation—to show how Cede voted particular shares. Imposing a share-tracing requirement therefore implied that no stockholder who held through Cede could seek appraisal. Investors who bought after the record date would not be able to trace their shares to a prior beneficial owner with the legal authority to direct how the shares were voted. More broadly, investors who held on the record date would not be able to prove how Cede voted the shares for which appraisal

---

[7] *See In re Appraisal of Ancestry.com, Inc.*, 2015 WL 66825 (Del. Ch. Jan. 5, 2015); *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 67586 (Del. Ch. Jan. 5, 2015); *In re Appraisal of Transkaryotic Therapies, Inc.*, 2007 WL 1378345 (Del. Ch. May 2, 2007).

was sought. As the parties presented it, a share-tracing requirement would foreclose street-name holders from seeking appraisal.

Not surprisingly, the Appraisal Arbitrage Decisions rejected a share-tracing requirement. They did so by stressing that the Record Holder Requirement called for considering only Cede's actions. But the decisions then took the additional step of seemingly equating the analysis of Cede's voting behavior with an exclusive focus on the aggregate voting totals provided at the meeting. In a case where everyone agreed that no one could show anything more, stopping there made sense. Before this case, the Delaware courts had never confronted a situation in which the evidence showed that Cede in fact voted the shares for which appraisal was sought in favor of the merger giving rise to appraisal rights.

The existence of evidence showing how Cede voted the T. Rowe Petitioners' shares warrants distinguishing the Appraisal Arbitrage Decisions as addressing situations in which there was an evidentiary vacuum. That scenario necessarily prevails at the pleading stage, and it may persist after discovery, as it did in those cases. The holdings of the Appraisal Arbitrage Decisions mean that a petitioner can establish a *prima facie* case that the Dissenter Requirement was met by showing that Cede held a sufficient number of shares that were not voted in favor of a merger to cover the appraisal class. At that point, the burden shifts to the respondent corporation to adduce evidence showing how Cede actually voted the shares for which appraisal was sought. If the corporation can rebut the petitioner's *prima facie* case and demonstrate that Cede actually voted the particular

27

shares in favor of the merger, then the appraisal petitioner cannot satisfy the Dissenter Requirement for those shares.

In my view, distinguishing the Appraisal Arbitrage Decisions on this ground is necessary to avoid an absurd result. If a court cannot examine evidence regarding how Cede actually voted, then the combination of that evidentiary limitation and the Record Holder Requirement will permit an appraisal petitioner who holds in street name to give instructions to vote its shares in favor of a merger, have those instructions carried out by the record holder, and then nevertheless seek an appraisal for the very same shares, as long as there were sufficient shares that Cede had not voted in favor of the merger to cover the appraisal class. Under that scenario, a non-dissenter can pursue dissenters' rights. It seems absurd to interpret one statutory provision (the Record Holder Requirement) so broadly that investors can act directly contrary to a second statutory provision (the Dissenter Requirement).

In this case, Dell proved that Cede (through Broadridge) voted the shares for which the T. Rowe Petitioners now seek appraisal in favor of the Merger. The Dissenter Requirement was not met for these shares, so no one can seek appraisal for them.

A.      **The Statute And Delaware Supreme Court Precedent**

Section 262(a) of the DGCL confers appraisal rights upon

> [a]ny stockholder of a corporation of this State [1] who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, [2] who continuously holds such shares through the effective date of the merger or consolidation, [3] who has otherwise complied with subsection (d) of this section and [4] who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title . . . .

28

8 *Del. C.* § 262(a) (enumeration added). This decision has referred to the fourth prerequisite as the Dissenter Requirement. Section 262(a) also contains the Record Holder Requirement, which defines "stockholder" for purposes of the appraisal statute as "a holder of record of stock in a corporation." *Id.*

As written, the prerequisites of Section 262(a) can be read as all-or-nothing propositions that require a stockholder to act uniformly as to all of its shares. For the Dissenter Requirement, this would mean that a stockholder would be foreclosed from seeking appraisal if it voted a single share in favor of the merger.[8] But that is not how the Delaware Supreme Court interpreted the statute in *Reynolds II* and *Olivetti II*, the seminal precedents in this area. Motivated in large part by the likelihood that a record holder was a broker or other nominee that owned shares on behalf of multiple clients, and that those clients might differ about whether to seek appraisal, both *Reynolds II* and *Olivetti II* permitted a stockholder of record to split its vote and seek appraisal for shares that were not voted in favor of the merger. Writing while a Vice Chancellor, Chief Justice Strine summarized the rule from the decisions as follows:

---

[8] *See Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp. Ltd.*, 847 A.2d 340, 365 (Del. Ch. 2004) (Strine, V.C.) (observing that statute can be read in this "hyper-literal" manner); *see also BMC*, 2015 WL 67586, at *3 n.23 (confirming that none of the parties were arguing for this reading and that everyone in the case agreed that "the statute means the stockholder has not voted in favor of the merger or consented to it with respect to the shares it seeks to have appraised"). In this case, Dell observed that the statute could be read literally to "disqualify any stockholder of record who votes even a single share in favor of a merger," but stated that it "does not advocate that approach, which would be inconsistent with decades of practice." Dkt. 306 at 28-29 n.24.

> It is understood by now that an entity like Cede & Co. that is record holder (but not beneficial holder) of a company's shares can vote certain of those shares against a merger, and others in favor, and seek appraisal as to the dissenting shares. This makes sense, of course, because Cede often represents a large number of beneficial holders in the same company, holders whose views on the advisability of a merger might diverge.

*Union Ill.*, 847 A.2d at 365 (footnote omitted).

The concept of vote splitting has relevance to this case, because one consequence of permitting vote splitting is that a record holder only can seek appraisal for the specific shares that were not voted in favor of the merger. Both *Reynolds II* and *Olivetti II* therefore shed light on the degree to which the appraisal statute requires linking the record holder's actions to the specific shares for which appraisal is sought. Given the importance of these decisions, it is worth considering them at greater length.

### 1. *Reynolds*

The Delaware courts first addressed vote splitting (and implicitly the need for share tracing) in the *Reynolds* litigation. The petitioner was a broker, Bache & Co., who was the holder of record for 81,384 shares of stock of Reynolds Metals Company. Two days before a meeting of stockholders at which a merger would be considered, Bache & Co. submitted a proxy to Reynolds that voted 29,475 shares "FOR" the merger and 612 shares "AGAINST" the merger. One day before the meeting, Bache & Co. gave Reynolds a second proxy that voted 29,728 shares "AGAINST" the merger. Bache & Co. contemporaneously sent a letter objecting to the merger and indicating that appraisal

30

would be sought for the 29,728 shares, as required by the appraisal statute at that time.[9]

After the meeting, as the appraisal statute then contemplated, Bache & Co. demanded appraisal as to those 29,728 shares. When the demand was rejected, Bache & Co. sought appraisal for the 29,728 shares. *See Colonial Realty Corp. v. Reynolds Metals Co.* (*Reynolds I*), 185 A.2d 754, 754-55 (Del. Ch. 1962), *aff'd*, 190 A.2d 752 (Del. 1963).

Reynolds moved for summary judgment, contending that Bache & Co. could not seek appraisal because it had voted some of its shares in favor of the merger. On the facts presented, the Court of Chancery framed the legal issue as "whether a stockholder who has voted some of the shares registered in his name for a proposed merger may dissent *as to other shares not so voted* and obtain an appraisal therefor." *Id.* at 757 (emphasis added). This court observed that the operative language of the Dissenter Requirement as it existed at the time did not expressly authorize vote splitting, but also did not "expressly, or by unavoidable intendment, disqualif[y]" a stockholder from doing so.[10]

---

[9] Before 1976, a stockholder who wanted to exercise appraisal rights had to send a written objection to the corporation before the merger vote, then submit a written demand for appraisal after the merger vote. *See* 2 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 262, at IX-159 (3d ed. 2014). Since 1976, a stockholder seeking appraisal no longer has to make a separate objection. If the merger will be considered at a meeting of stockholders, the stockholder need only submit a demand for appraisal before the vote takes place. *See* 8 *Del. C.* § 262(d)(1).

[10] *Id.* at 758. The operative language was framed in the passive voice and authorized appraisal for a stockholder "whose shares were not voted in favor of such consolidation or merger." *Id.* at 757. In 1976, the General Assembly changed the language from passive to active, resulting in the current form of the Dissenter Requirement. *See* 60 Del. Laws ch. 371 (1976). The parties have not identified (and the

Turning to the realm of policy, the Court of Chancery perceived nothing that weighed for or against vote splitting and no harm from permitting the practice. This court also saw no disadvantage to the corporation because the record holder complied with all of the statutory requirements as to the pertinent shares.

> The stockholder here gave the required written notice of objection to the merger with respect to the very shares for which an appraisal is sought. . . . The objection stated the number of shares as to which dissent was made. . . . Therefore, not only was [the] corporation . . . fully informed of the dissent, but Bache & Co., the registered holder of the shares involved, voted the same against the merger.

*Reynolds I*, 185 A.2d at 758.

Finally, the Court of Chancery took into account "the realities of the market place in security transactions" and the fact that "brokers such as Bache & Co. hold many blocks of stock in 'street name' for numerous beneficial holders." *Id.* This court recognized that "[t]o say that the broker should be denied the right to object to a merger and seek appraisal of shares held for one beneficial owner because other beneficial owners insist upon voting in favor of the merger is to ignore the reality of a recognized practice." *Id.* The court reasoned that "[s]ince the holding of shares in 'street name' is a wide-spread practice and undoubtedly serves legitimate and useful purposes, the true owner should not be penalized for following the practice." *Id.* at 748-59. The court concluded that

---

court has not otherwise located) legislative history or contemporaneous commentary suggesting that the amendment sought to foreclose vote splitting or restrict the ability of a stockholder to seek appraisal for particular shares, as long as the stockholder met the requirements of the appraisal statute for those shares. As previously noted, Dell eschews that line of argument.

> [p]ractical considerations suggest the desirability of permitting a stockholder to split his stock in merger proceedings. Where this can be done without disadvantage to the majority stockholders and without contravening applicable statutory provisions, the right of the stockholders to so proceed should be recognized.

*Id.* at 759. The Court of Chancery therefore denied Reynolds' motion for summary judgment.

On appeal, the Delaware Supreme Court affirmed. Like the Court of Chancery, the Delaware Supreme Court focused on how the record holder voted the particular shares for which appraisal was sought, framing "the sole question in the case" as "whether the vote in favor of the merger cast by the broker as the registered holder *of certain shares* makes the broker ineligible under the law to demand appraisal in respect *of other shares*." *Reynolds II*, 190 A.2d at 753 (emphasis added). The high court noted that if the corporation was right, then "all of the customers of a broker who wish to exercise the right of appraisal are without remedy if one other customer holding a single share insists that the broker vote it in favor of the merger." *Id.* at 754. The opinion described that conclusion as "not an appealing one" and later referred to "the unjust consequences of defendant's contention." *Id.*

After distinguishing the cases that Reynolds claimed required a ruling in its favor, the Delaware Supreme Court discussed a concession that Reynolds had made and its implications:

> Defendant concedes that a trustee holding shares for the benefit of two beneficiaries under a trust could vote one beneficiary's shares in favor of the merger and demand appraisal of the remaining shares. This, says defendant, is because there are two entities voting, a trustee for A and a trustee for B. For the matter of that, so are there really two entities in cases

33

> such as the one before us: Bache & Co., agent for Colonial [who sought appraisal], and Bache & Co. agent for other customers—or, perhaps, Bache & Co. in its own right [who did not seek appraisal].

*Id.* at 755. As the analogy demonstrates, the Delaware Supreme Court focused not only on the record holder doing the voting, but also on the specific shares being voted. As in the lower court decision, what mattered in the Delaware Supreme Court's decision was how the stockholder of record voted the particular shares for which appraisal was sought.

In a related part of *Reynolds II*, the Delaware Supreme Court observed that if a corporation was concerned about whether a record holder had authority to seek appraisal as the agent of a beneficial holder, then "it may inquire into the facts." *Id.* That observation has salience for this case because in *Olivetti II,* just three years later, the Delaware Supreme Court backed away from this language and rejected a corporation's ability to explore the extent of the record holder's authority. The T. Rowe Petitioners stress this aspect of *Olivetti II*, claiming that it overruled any suggestion of share tracing from *Reynolds II*, but as will be seen when this decision discusses *Olivetti II*, that decision did not alter the focus on how the record holder voted particular shares.

The Delaware Supreme Court also confronted in *Reynolds II* an argument that Bache & Co. held its shares as "fungible goods" that were not allocated to particular customers and thus "[t]he shares which Bache & Co. voted against the merger, and in respect of which it demanded appraisal, are not identifiable; *i.e.* cannot be distinguished from the shares voted for the merger." *Id.* at 756. Anticipating the concept of share tracing, Reynolds contended that because the shares were not identifiable, it was

34

impossible to identify the particular shares that were not voted in favor of the merger. The Delaware Supreme Court made short work of that ostensible problem:

> This argument seems inconsistent with defendant's admission that Bache & Co. could properly split its vote. In any event, what difference does it make that at the time of voting the shares were not represented by identified certificates? After the appraisal is made, certificates representing the shares will be surrendered. Defendant is really repeating in another form its contention that a vote by a broker of one share in favor of the merger disqualifies all the other shares from appraisal. For the reasons heretofore given, we disagree.

*Id.* In other words, as the Delaware Supreme Court saw it, if there was evidence about how the record holder actually voted the specific shares, it did not matter that the shares themselves were held in fungible bulk.

Finally, the Delaware Supreme Court agreed with the Court of Chancery about the need for "recognition of the realities of modern stock practices and the necessity to afford such protection to stock beneficially owned as is not inconsistent with protection of the corporation's rights." *Id.* These realities counseled in favor of permitting a record holder that was acting on behalf of clients to split its vote. The opinion confined its ruling "to the facts of this case—the case of a beneficial owner and nominee." *Id.*

### 2.    *Olivetti*

Three years after *Reynolds II*, the Delaware Supreme Court revisited the question of vote splitting (and the implicit concept of share tracing) in *Olivetti II*. The petitioners were brokers who were holders of record of shares of Olivetti Underwood Corporation. The brokers made appraisal demands in which they notified Olivetti that they were holders of record but did not beneficially own the stock registered in their names. They

35

did not submit proof of their authority to act for the beneficial owners. When the brokers subsequently filed appraisal petitions, Olivetti argued that the absence of proof of authority to act on behalf of the beneficial owner was a fatal defect under *Reynolds II*.

The Court of Chancery disagreed and permitted the petitioners to seek appraisal. *See Abraham & Co. v. Olivetti Underwood Corp. (Olivetti I)*, 204 A.2d 740, 741 (Del. Ch. 1964) (Seitz, C.), *aff'd sub nom. Olivetti II*, 217 A.2d at 688. Chancellor Seitz distinguished between two questions of law. The first was whether a broker that was a holder of record could split its position, vote shares held for certain customers in favor of the merger, vote other shares held for different customers against the merger, and then seek appraisal for the latter group of shares. The second and distinct issue was whether a holder of record had to provide the corporation with evidence of its authority to seek appraisal on behalf of the beneficial owner, such that a record holder that did not provide evidence of authority from the beneficial holder could not pursue an appraisal.

Chancellor Seitz explained that only the first question was actually at issue in *Reynolds II*, which "dealt with the right of a broker registered owner to vote certain of such shares for a merger and then seek an appraisal as to other shares so held." *Id.* at 741. He conceded that the *Reynolds II* decision "did say that the corporation could inquire into the authority of the registered stockholder to act as agent," but he explained why that comment was not controlling:

> The [*Reynolds II*] court cited *Zeeb v. Atlas Power Co.*, [87 A.2d 123 (Del. Ch. 1952)], as being applicable by analogy. In that case the corporation was held to have the burden of showing lack of authority in challenging a stockholder's right to an appraisal and in that connection was said to have the right to inquire.

> The *Reynolds* case involved the right of the corporation to question whether a stockholder had complied with statutory prerequisites to an appraisal. No such issue is here involved. The *Zeeb* case involved action by a purported agent of a registered stockholder and the issue was whether evidence of the agent's authority had to be presented by the agent. There is no question of any purported agent's authority here insofar as compliance with the appraisal statute is concerned. I conclude that neither the *Reynolds* nor the *Zeeb* case is applicable here.

*Id.* at 741. Chancellor Seitz thus treated the discussion of the second question in *Reynolds II* as dictum that was not relevant to the opinion's holding on vote splitting.

Having concluded that *Reynolds II* was not controlling, the Chancellor considered the merits of the corporation's argument independently. He rejected the contention that a corporation who learns that a record holder is seeking appraisal for a beneficial owner has "a duty to seek proof of his authority to act," observing that such a duty would "inject the corporation into one of the very problems from which it is insulated by being able to rely on the stock ledger." *Id.* He observed that the absence of any duty of inquiry was "particularly true where, as here, the corporation has no evidence that the registered owners may be acting contrary to the wishes of the beneficial owners." *Id.* He then held that "in this posture of the case at least, the corporation has no right to raise any issue as to the right of a registered owner to seek a statutory appraisal and such a stockholder has no duty to supply proof as to that issue." *Id.*

Olivetti appealed, and the Delaware Supreme Court affirmed. Like Chancellor Seitz, the Delaware Supreme Court distinguished two separate questions. The first was the issue of vote splitting from *Reynolds II*. The second was whether the corporation had "the right to require each broker-petitioner to prove, as a prerequisite to the statutory right

of appraisal, that it was duly authorized by the beneficial owner of the stock, registered in its name, to seek the appraisal." *Olivetti II*, 217 A.2d at 684.

The Delaware Supreme Court dealt with the second question first. Foreshadowing its view of the language from *Reynolds II* on which the corporation relied, the high court cited *In re Northeastern Water Co.*, 38 A.2d 918 (Del. Ch. 1944), not *Reynolds II*, as "[t]he Delaware case most nearly in point." *Olivetti II*, 217 A.2d at 684. After observing that the *Northeastern* case addressed whether a holder of record must provide evidence of his authority to seek appraisal on behalf of a beneficial holder, the *Olivetti II* court quoted the following passage:

> No sufficient reason appears why the corporation should be permitted to challenge the action of the present registered holders. A liberal construction of the appraisal statute requires the avoidance of complexities in proceedings under it, particularly where the corporation will not be subjected to risks of liability. Since the registered holders are entitled to proceed under the statute, proof that they have complied with its requirements should be enough to establish their right to an appraisal. Accordingly, the claimants need not furnish evidence of their authority to act.[11]

---

[11] *Olivetti II*, 217 A.2d at 685 (quoting *Northeastern*, 38 A.2d at 925). The reference in *Northeastern* to the "liberal construction of the appraisal statute" referred to the procedure for making objections under the version of the appraisal statute that existed before 1976. *See supra* note 9. The Delaware Supreme Court construed the objection requirement more liberally than the demand requirement because "[t]he purpose of the objection [was] of lesser importance than the demand for payment." *Raab v. Villager Indus., Inc.*, 355 A.2d 888, 891 (Del. 1976). Stockholders seeking appraisal no longer have to make a separate objection, and Delaware decisions have *not* generally construed other aspects of the appraisal statute liberally in favor of stockholders. *See generally* Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations* § VIII, at A-97 (2012) (collecting cases). The Delaware Supreme Court has endorsed a principle of strict construction, explaining that "[b]y exacting strict

The high court next turned to the passage from *Reynolds II* on which Olivetti relied and which suggested that a corporation could inquire into the record holder's authority. After quoting the passage, the high court dismissed it as "clearly *obiter dicta*," thus reaching the same conclusion as Chancellor Seitz. *Olivetti II*, 217 A.2d at 685.

Like the Chancellor, the Delaware Supreme Court next considered whether the dicta from *Reynolds II* nevertheless should "be given the force and effect of law." *Id.* The high court rejected the corporation's argument that a record holder should have to provide evidence of its authority to act on behalf of a beneficial owner. But where the Court of Chancery limited its ruling to the facts presented, in which the corporation had no indication that the record holder was acting contrary to the wishes of the beneficial holder, the Delaware Supreme Court went further and held broadly that a corporation should not inquire into the record holder's authority:

> The corporation is entitled to confine itself to dealing with registered stockholders in intracorporate affairs such as mergers; it should avoid becoming involved in the affairs of registered stockholders vis-a-vis beneficial owners; and, in so doing, in the best interests of all stockholders, the corporation should avoid becoming involved in the expensive and time-consuming trial of such collateral issues in merger appraisal proceedings.

---

compliance . . . , the appraisal statute ensures the expedient and certain appraisal of stock." *Ala. By-Products Corp. v. Cede & Co.*, 657 A.2d 254, 263 (Del. 1995). In subsequently re-affirming its adherence to the principle, the Delaware Supreme Court cautioned that strict construction should be applied "even-handedly, not as a one-way street." *Berger v. Pubco Corp.*, 976 A.2d 132, 144 (Del. 2009). In other words, both petitioners and the corporation must adhere strictly to the appraisal statute's requirements; neither gets the benefit of the doubt under more a lenient rule of "liberal construction."

> We hold that insofar as the *dicta* in the *Reynolds* case may be contrary to the foregoing, it will be disregarded.

*Id.* at 686. This holding answered the second question presented in *Olivetti II*: whether a corporation could question a record holder's authority to seek appraisal. The answer to that question was "no."

This left the first of the Delaware Supreme Court's two questions: the propriety of vote splitting (and the implicit concept of share tracing). As its final argument in favor of requiring the record holder to demonstrate authority to seek appraisal, the corporation argued that "unless the [respondent] is permitted to inquire into the identity and authority of the beneficial owners, it will be unable to determine whether a beneficial owner is seeking to take inconsistent positions by accepting the $10 per share, offered under the merger plan, for a portion of his stock, and demanding appraisal as to the balance." *Id.* at 687. The *Olivetti II* court noted that *Reynolds II* involved two different beneficial holders, so "it was unnecessary to rule on the right of a registered stockholder holding the beneficial ownership to split his demand for appraisal, and we limited the holding of that case to the ruling that a broker as nominee may do so." *Id.* The *Olivetti II* court also noted that the facts before it similarly involved multiple beneficial holders, so the question of vote splitting by the same beneficial owner was not presented. Moreover, the case involved a short-form merger in which stockholders were not given the opportunity to vote, so the concept of voting in favor of the merger was not present. But as to the question of whether a single beneficial holder following a short-form merger could seek appraisal for only part of its shares, the high court held as follows:

40

[W]e find no valid reason in the letter or spirit of the Statute, in the cases, or in consideration of fairness, which would bar a stockholder from "hedging" his position by electing to accept the offered price as to some of his stock and demanding appraisal as to the rest. We think that stockholders should have such flexibility and freedom of choice; and we so hold.

*Id.* In other words, as long as the record holder complied with the requirements of the appraisal statute for the portion of the beneficial holder's shares for which appraisal was sought, the record holder could seek appraisal as to those shares.

Contrary to the position taken by the T. Rowe Petitioners, *Olivetti II* did not overrule *Reynolds II* on the issue of vote splitting. The *Olivetti II* ruling instead expanded that aspect of *Reynolds II* by permitting a single beneficial holder to split its position following a short-form merger. What remained was the need for the record holder to satisfy the requirements of the appraisal statute for those shares for which appraisal was sought.

### 3. The Implications of *Reynolds II* and *Olivetti II*

Based on *Reynolds II* and *Olivetti II*, it would seem that satisfying the requirements of Section 262(a) involves a two part inquiry: Did the (i) specific record holder meet the statutory prerequisites with respect to the (ii) specific shares for which appraisal is being sought? Both aspects—the record holder and the specific shares—are central. After these decisions, a particular record holder could split its position and seek appraisal for part of its shares as long as it had not voted in favor of the merger with regard to the particular shares for which appraisal was sought. The record holder could not seek appraisal for shares voted in favor of the merger, but the fact that it split its vote

41

would not preclude the record holder from satisfying the Dissenter Requirement for other shares.

The decisions in *Reynolds II* and *Olivetti II* do not suggest that a court should limit the types of evidence it considers in determining how a record holder voted particular shares. In *Reynolds II*, for example, the record holder delivered separate proxies for the two blocks of shares it held on behalf of different groups of clients. The proxy provided evidence that the record holder in fact voted against the merger with respect to the block of 29,728 shares for which appraisal was sought. The Court of Chancery noted specifically that Bache & Co., "the registered holder of the shares involved, voted the same against the merger." *Reynolds I*, 185 A.2d at 758. On appeal, the Delaware Supreme Court used its analogy of a trustee voting differently on behalf of two beneficiaries to emphasize the link between the shares for which appraisal was sought and how they were voted. *Reynolds II*, 190 A.2d at 755. Perhaps more importantly, the Delaware Supreme Court rejected the corporation's argument that the shares Bache & Co. held were fungible goods such that it was impossible to identify any shares that were not voted in favor of the merger. The Delaware Supreme Court instead linked the holder of record's voting of particular shares to its ability to pursue appraisal for those shares by affirming this court's holding that a broker-as-record-holder could split its shares and vote differently on behalf of different clients without losing the ability to pursue appraisal on behalf of the dissenting client. Subsequently in *Olivetti II*, the Delaware Supreme Court expanded its holding in *Reynolds II* on vote splitting by permitting a holder of record after a short-form merger to seek appraisal as to part of its position but not

42

another, as long as the holder of record complied with the requirements of the appraisal statute as to the shares for which appraisal was sought. Rather than undermining *Reynolds II* on that issue, *Olivetti II* reinforced it.

## B. The Appraisal Arbitrage Decisions

The development of the law did not stop with *Reynolds II* and *Olivetti II*. The most recent learning comes from the Appraisal Arbitrage Decisions. Because of their importance to the outcome of this case, it is worth discussing each decision.

### 1. *Transkaryotic*

The first of the Appraisal Arbitrage Decisions was *In re Appraisal of Transkaryotic Therapies, Inc.*, 2007 WL 1378345 (Del. Ch. May 2, 2007). On the record date for the merger giving rise to appraisal rights, five investment funds beneficially owned 2,901,433 shares. After the record date but before the effective date, they purchased another 8,071,217 shares in the open market. They sought appraisal for all 10,972,650 shares. The respondent corporation ("TKT") moved for partial summary judgment, contending that the petitioners could not seek appraisal for the shares acquired after the record date because they could not prove that a previous beneficial owner had not voted the shares in favor of the merger. *Id.* at \*1.

The *Transkaryotic* court rejected this contention:

The question presented in this case can be stated thusly: Must a beneficial shareholder who purchased shares *after* the record date but before the merger vote, prove, by documentation, that each newly acquired share (*i.e.*, after the record date) is a share not voted in favor of the merger by the *previous* beneficial shareholder? The answer seems simple. No. Under the literal terms of the statutory text and under longstanding Delaware Supreme Court precedent, only a record holder, as defined in the DGCL, may claim

43

and perfect appraisal rights. Thus, it necessarily follows that the record holder's actions determine perfection of the right to appraisal.

*Id.* at *3.

This aspect of *Transkaryotic* seems straightforward and non-controversial. The Record Holder Requirement dictates that the record holder's actions determine perfection of the right to appraisal. The more difficult questions are (i) whether a petitioner must show how the record holder (not the beneficial holder) voted particular shares, and (ii) what evidence can be used to demonstrate how the record holder voted.

As the centerpiece of its analysis, the *Transkaryotic* decision summarized *Olivetti II*, noting that the decision had addressed "whether a respondent corporation had a right to require each broker-petitioner to prove, as a prerequisite to the statutory right of appraisal, that it was duly authorized by the beneficial owner of the stock to seek appraisal." *Id.* at *4. The *Transkaryotic* opinion drew from *Olivetti II* the following principles:

- "'[T]here must be order and certainty, and a sure source of information, so that the corporation may know who its members are and with whom it must treat.'" *Id.* (quoting *Olivetti II*, 217 A.2d at 685).

- "'[C]orporations ought not to be involved in possible misunderstandings or clashes of opinion between non-registered and registered holders of stock.'" *Id.* (quoting *Olivetti II*, 217 A.2d at 686).

- "A corporation 'may rightfully look to the corporate books as the sole evidence of membership' because under Delaware law, 'there is no recognizable stockowner under § 262 except a registered stockholder.'" *Id.* (quoting *Olivetti II*, 217 A.2d at 686).

- "'The relationship between, and the rights and obligations of, a registered stockholder and his beneficial owner are not relevant issues in a proceeding of this kind." *Id.* (quoting *Olivetti II*, 217 A.2d at 687).

- "A beneficial owner must 'establish his rights and pursue his remedy through the nominee of his own selection.'" *Id.* (quoting *Olivetti II*, 217 A.2d at 686).

Based on these statements from *Olivetti II* and the record before it, the court again reached the non-controversial conclusion that "the determinative record regarding compliance with § 262 requirements is that of the record holder." *Id.*

These passages from *Olivetti II* notably addressed only whether the record holder needed to establish that it had authority from the beneficial holder to seek appraisal. With the following explanation, the *Transkaryotic* opinion applied them to the issue of how the record holder voted the shares for which appraisal was sought:

> The issue here mirrors that in *Olivetti Underwood Corp*. Respondent corporation, TKT, seeks to examine relationships between Cede (the record holder) and certain non-registered, beneficial holders in order to determine the existence of appraisal rights. But the Supreme Court has already deemed this relationship to be an improper and impermissible subject of inquiry in the context of an appraisal. The law is unequivocal. A corporation need not and should not delve into the intricacies of the relationship between the record holder and the beneficial holder and, instead, must rely on its records as the sole determinant of membership in the context of appraisal. Thus, following the clear teachings of *Olivetti Underwood Corp.*, I conclude, in the circumstances here, that only Cede's actions, as the record holder, are relevant.

*Id.* at *4. Again, the conclusion that "only Cede's actions, as the record holder are relevant," was straightforward. The significant move was to equate how Cede voted the specific shares for which the beneficial holder later sought appraisal with "the relationship between the record holder and the beneficial holder." One could just as easily view how Cede voted as a factual issue reflecting the record holder's actions and not involving a "relationship" with the beneficial holder.

45

Having concluded that only Cede's actions were relevant, *Transkaryotic* made a second and equally significant move by restricting its analysis to the documents presented at the meeting of stockholders that showed how Cede voted in the aggregate:

> It is uncontested that Cede voted 12,882,000 shares in favor of the merger and 16,838,074 against, abstained, or not voted in connection with the merger. It is further uncontested that Cede otherwise properly perfected appraisal rights as to all of the 10,972,650 shares that petitioners own and for which appraisal is now sought. Thus, because the actions of the beneficial holders are irrelevant in appraisal matters, the inquiry ends here.

*Id.* at *4. The key step was to hold that "the inquiry ends here," thereby appearing to foreclose inquiry into how Cede voted particular blocks of shares.

The parties in *Transkaryotic* do not appear to have argued, and the court did not consider, whether other readily available documents might show how Cede voted particular shares. No one appears to have mentioned the federal requirement that mutual funds must file a Form N-PX disclosing how they voted their shares (although that regulation may not have applied to the investment funds in *Transkaryotic*). No one seems to have discussed Broadridge's role or the voting authentication documents that Broadridge maintains.[12] Nor does anyone appear to have argued that these documents could be used *not* for the purpose of challenging aspects of the relationship between the

_____

[12] Referring to Broadridge in this context is admittedly anachronistic. At the time of the merger that gave rise to the *Transkaryotic* decision, the business that became Broadridge was the proxy services division of Automatic Data Processing, Inc., better known as ADP. The entity now known as Broadridge was incorporated in March 2007 in connection with its spin-off from ADP. *See* History, Broadridge Fin. Sols. http://www.broadridge-ir.com/investor-overview/history.aspx (last visited May 8, 2016).

record holder and the beneficial holder, like the authority question raised in *Olivetti II*, but to show how the record holder *qua* record holder voted the shares for which appraisal was sought.

In a final turn to public policy, the *Transkaryotic* court acknowledged the corporation's argument that its ruling could "encourage appraisal litigation initiated by arbitrageurs who buy into appraisal suits by free-riding on Cede's votes on behalf of other beneficial holders." *Id.* at *5. The court admonished that

> [t]o the extent that this concern has validity, relief more properly lies with the Legislature. Section 262, as currently drafted, dictates the conclusion reached here. Only the record holder possesses and may perfect appraisal rights. The statute simply does not allow consideration of the beneficial owner in this context. The Legislature, not this Court, possesses the power to modify § 262 to avoid the evil, if it is an evil, that purportedly concerns respondents.

*Id.*

### 2. *BMC*

Eight years later, this court rendered its decision in *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 67586 (Del. Ch. Jan. 5, 2015). The petitioners there were two investment funds—Merion Capital LP and Merion Capital II LP—that specialized in appraisal arbitrage. After the announcement of a merger giving rise to appraisal rights, the Merion funds purchased 7,629,100 shares of stock in the open market. The shares they bought were held by DTC in fungible bulk within the FAST Account, but when the Merion funds asked their DTC-participant broker to cause Cede to demand appraisal, the broker declined. The Merion funds responded by withdrawing their shares from the

47

FAST Account, having them certificated, and demanding appraisal. After the merger closed, the Merion funds petitioned for appraisal.

As in *Transkaryotic*, the respondent corporation argued that "Merion, as the record holder, bears the burden of proving that *each share* it seeks to have appraised was not voted by any previous owner in favor of the merger—a burden, if it exists, that Merion concededly has not met." *Id.* at *3. The corporation felt it had grounds to distinguish *Transkaryotic* because Merion was a record holder, not the beneficial holder of shares held in fungible bulk.

As in *Transkaryotic*, the record evidence before the court suggested that it would be impossible for an appraisal petitioner who held in street name or through Cede or had acquired shares in the open market to meet the burden that the corporation sought to impose. One of the principals of the Merion funds testified that

> because Merion purchased its shares on the open market, it cannot identify the entities from which it purchased its shares. In addition, because Merion's shares were transferred from the "fungible mass at DTC/Cede," Merion is not able to say how the specific shares it came to hold on record were voted in the transaction . . . .

*Id.* at *3 n.21 (citation omitted). Notably, the second obstacle would affect any beneficial holder who had an entitlement on the record date or gained an entitlement after the record date to shares held in fungible bulk in the FAST Account, then moved into record position. Based on the Merion witness's testimony, no such holder would be "able to say how the specific shares it came to hold on record were voted in the transaction." And the same would be true for any investor who did not move into record position and thus chose to continue holding a proportionate entitlement to the fungible bulk. Such an

48

investor would not be able to say how specific shares were voted either. Consequently, if the court accepted the respondent corporation's argument on the record presented, no one holding through Cede would be able to satisfy the requirements for an appraisal. Like the corporation's argument against a record holder splitting its vote in *Reynolds II*, the respondent's position in *BMC* threatened "unjust consequences" and was therefore "not an appealing one." *Reynolds II*, 190 A.2d at 754.

As had the *Transkaryotic* court, the *BMC* decision treated the Record Holder Requirement as dictating the answer:

> The statute's requirements are directed to the *stockholder*—expressly defined as the *record holder*—and whether *it* has owned the stock at the appropriate times, whether *it* has made a sufficient demand, and whether *it* has voted the shares it seeks to have appraised in favor of the merger. My interpretation of Section 262(a) as clear in that regard is consistent with *Transkaryotic*. In that case, then-Chancellor Chandler determined that Cede did not have to demonstrate that each individual share it sought to have appraised was a share it did not vote in favor of the merger, but was only required to show that it held a quantity of shares it had not voted in favor of the merger equal to or greater than the quantity of shares for which it sought appraisal. The Court's focus was on the *petitioner/record holder*, not on the *shares*—in other words, on whether Cede had sufficient shares it had not voted in favor of the merger to satisfy the demand, not on whether those specific shares were shares Cede had voted in favor of the merger.

*BMC*, 2015 WL 67586, at *6 (footnote omitted). On the facts presented in *BMC*, as in *Transkaryotic*, Cede held enough shares that were not voted in favor of the merger to cover the appraisal class.

The corporation argued that looking only at Cede's aggregate voting totals could produce an absurd result, but the corporation did not make the straightforward argument (presented by this case) that looking no further than Cede's aggregate voting totals could

permit an investor to submit instructions that shares be voted in favor of a merger and yet still pursue appraisal rights for those shares. Instead, the corporation pointed to a less realistic, more academic scenario,

> namely that a failure of this Court to read a share-tracing requirement into the statue could allow a majority, or even all of a corporation's shares [to seek] appraisal, notwithstanding the fact that for a transaction to have been approved, at least a majority of the shares would have had to have been voted in favor of it.

*Id.* at *7 (quotation marks omitted). This hypothetical situation was not presented on the facts of the case, and the *BMC* decision understandably declined to construe the appraisal statute to anticipate a problem that seemed unlikely to occur.

Interestingly, although the *BMC* decision ultimately held that only Cede's aggregate votes counted, other language in the decision linked a petitioner's ability to seek appraisal to how the record holder acted as to the specific shares for which appraisal was sought. At the outset, when framing the statutory requirements, the *BMC* decision stressed both compliance by the record holder and the need to demonstrate compliance as to particular shares:

> [I]n order for a petitioner to perfect the appraisal remedy according to the plain language of Section 262(a), the petitioner need only show that the *record holder* of the stock for which appraisal is sought: (1) held *those shares* on the date it made a statutorily compliant demand for appraisal on the corporation; (2) continuously held *those shares* through the effective date of the merger; (3) has otherwise complied with subsection (d) of the statute, concerning the form and timeliness of the appraisal demand; and (4) has not voted in favor of or consented to the merger *with regard to those shares*.

*Id.* at *3 (first emphasis in original). The references to "those shares" in the enumerated subsections (1), (2) and (4) suggested a link between the record holder's actions and the

50

specific shares for which the petitioner was pursuing appraisal. In a footnote, the decision emphasized the connection to specific shares, noting that everyone in the case agreed that "the statute means the stockholder has not voted in favor of the merger or consented to it *with respect to the shares it seeks to have appraised*." *Id.* at *3 n.23 (emphasis added).

Later, the *BMC* opinion similarly identified a link between the statutory prerequisites and particular shares:

> As mentioned above, in order to properly perfect the appraisal remedy under the plain language of Section 262(a), a petitioner need only show that the record holder of the stock for which appraisal is sought: (1) "[held such] shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares;" (2) "continuously [held] such shares through the effective date of the merger or consolidation;" (3) has otherwise complied with subsection (d) of this section;" and (4) "has neither voted [such shares] in favor of the merger or consolidation nor consented thereto in writing."

*Id.* at *6 (quoting 8 *Del. C.* § 262(a)) (alterations in original). The decision thus added the words "such shares" to clarify the implication of the Dissenter Requirement (*i.e.* that the record holder not have voted the specific shares for which appraisal is sought in favor of the merger).

Despite these formulations, the *BMC* decision declined to recognize the implied linkage, stating: "Noticeably absent from [Section 262(a)], or any language in the statute, is an explicit requirement that the stockholder seeking appraisal prove that the *specific shares* it seeks to have appraised were not voted in favor of the merger." *Id.* at *4. The decision also looked only to Cede's voting totals in the aggregate. To reiterate, there was no evidence in *BMC* as to how the record holder voted the specific shares, and the parties depicted a factual world in which it was impossible ever to develop that evidence.

51

It seems to me that the sections of the *BMC* decision that imply a necessary connection between the record holder's actions and the specific shares for which appraisal is sought reflect the soundness of the approach taken in *Reynolds II* and *Olivetti II* and the intuitive logic that a petitioner should only be able to seek appraisal for shares that the record holder did not vote in favor of the merger. But in *BMC*, as in *Transkaryotic*, the factual scenario that the parties presented meant that placing the burden on the petitioner to establish the connection would cut off appraisal rights for investors who held through Cede. An observation from five decades earlier in *Reynolds I* would seem to explain the outcome: "Since the holding of shares in 'street name' is a common and wide-spread practice and undoubtedly serves legitimate and useful purposes, the true owner should not be penalized for following the practice." 185 A.2d at 758-59. Presented with these stark choices, the *BMC* opinion appropriately followed *Transkaryotic*, looked only to Cede's aggregate voting totals, and permitted the Merion funds to seek appraisal.

### 3. *Ancestry*

On the same day that this court issued its opinion in *BMC*, it also released an opinion in *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 66825 (Del. Ch. Jan. 5, 2015). The petitioner in *Ancestry* was Merion Capital L.P., one of two appraisal arbitrage specialists from *BMC*. Merion again did not own any shares on the record date for the merger. After the record date, Merion purchased 1,255,000 shares in the open market and sought appraisal for those shares.

As in *BMC*, the respondent corporation made the same argument advanced in *Transkaryotic*, namely that a petitioner had to demonstrate that the shares for which it sought appraisal had not been voted in favor of the merger by a prior owner. In *Ancestry*, the corporation felt it had grounds to re-argue this aspect of *Transkaryotic* because in 2007, the General Assembly had amended the appraisal statute to permit a beneficial holder to act in its own name (i) when requesting a statement identifying the aggregate number of shares not voted in favor of the merger for which demands for appraisal had been received and (ii) when filing an appraisal petition. The new language stated:

> Notwithstanding subsection (a) of this section, a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition or request from the corporation the statement described in this subsection.

8 *Del. C.* § 262(e). The corporation argued that the reference to "shares of such stock" and the phrase "held . . . on behalf of such person" referred back to the specific shares not voted in favor of the merger and demonstrated a need for the appraisal petitioner to satisfy the Dissenter Requirement as to the particular shares for which appraisal was sought. The court made short work of this argument, noting that the statutory amendment was intended to simplify the procedure for pursuing appraisal and not to effect substantive change.

Having rejected the corporation's basis for reconsidering *Transkaryotic*, the court not surprisingly adhered to that precedent. As in *Transkaryotic*, the court held that Cede was the entity with the burden to establish compliance with Section 262(a). Summarizing *Transkaryotic*, the court stated that for purposes of the Dissenter Requirement, a

53

petitioner "need only show that the number of shares that [Cede] did not vote in favor of the merger is equal to or greater than the number of shares of stock for which it perfected appraisal on behalf of petitioning owners." *Ancestry.com*, 2015 WL 66825, at \*6. On the facts presented, "Cede had at least as many shares not voted in favor of the merger as the number for which demand was made." *Id.* at \*7. Consequently, the Dissenter Requirement was satisfied. Merion did not have to show more.

As in *BMC*, the corporation in *Ancestry* contended that a vote-tracing requirement was necessary to prevent the risk of "over-appraisal," which the court described as "a theoretical concern where the appraisal arbitrageur acquires stock after a record date, which stock may have been voted in favor of the merger by the seller," such that more shares seek appraisal than could possibly have voted against, abstained, or not voted at all with respect to the merger. *Id.* at \*8. As in *BMC*, the *Ancestry* decision rejected that argument as "a theoretical problem which is not present in the case." *Id.* The corporation did not raise the more straightforward concern, present in this case, that stopping with Cede's aggregate voting totals would permit investors who had given instructions to vote their shares in favor of the merger to seek appraisal, as long as Cede had failed to vote sufficient shares in favor of the transaction to cover the appraisal class.

Interestingly, like *BMC*, the *Ancestry* decision contained language which appeared to recognize that an appraisal petitioner should meet the requirements of Section 262(a) for the specific shares for which appraisal was sought. In text that closely resembled a passage from *BMC*, the court framed the requirements for pursuing appraisal as follows:

> [I]n order for a petitioner to perfect the appraisal remedy according to the plain language of Section 262(a), the petitioner need only show that the *record holder* of the stock *for which appraisal is sought*: (1) held *those shares* on the date it made a statutorily compliant demand for appraisal on the corporation; (2) continuously held *those shares* through the effective date of the merger; (3) has otherwise complied with subsection (d) of the statute, concerning the form and timeliness of the appraisal demand; and (4) has not voted in favor of or consented to the merger *with regard to those shares*.

*Id.* at *4 (first emphasis in original). For the Dissenter Requirement, this passage envisioned that the record holder "must not have voted *the stock for which appraisal is sought* in favor of the merger." *Id.* at *1 (emphasis added). Elsewhere, the opinion reiterated this point: "A stockholder may seek appraisal only for shares it has not voted in favor of a merger." *Id.* The decision also remarked that "a plain reading of the statute discloses that, for standing purposes, it remains the record holder who must not have voted *the shares for which it seeks appraisal*." *Id.* (emphasis added).

As with the comparable passages in *BMC*, these passages reveal the deep and intuitive logic of limiting a petitioner to pursuing an appraisal only for those shares where the record holder satisfied the requirements of Section 262(a). But as in *BMC* and *Transkaryotic*, the *Ancestry* case involved a factual scenario where allocating to the petitioner the burden of showing compliance appeared to eliminate appraisal rights for investors who held through Cede, which was not a viable position.

### 4. Distinguishing The Appraisal Arbitrage Decisions

There is language in the Appraisal Arbitrage Decisions which, if applied literally to this case, would preclude the court from considering anything other than Cede's aggregated votes on the Merger. That language suggests that as long as Cede did not vote

a quantity of shares in favor of the Merger sufficient to cover the appraisal class, then the Dissenter Requirement is satisfied. The jurists who wrote those passages, however, were deciding cases in which the record did not contain any evidence regarding how Cede voted particular shares and where the parties told the court it was impossible to develop any. In this case, there is evidence about how Cede actually voted particular shares.

Importantly, the Appraisal Arbitrage Decisions did not take the next step and hold that when an investor actually directs that its shares be voted in favor of the merger, and when Cede actually votes shares in accordance with the investor's instructions, then the investor can avoid the implications of the Dissenter Requirement by invoking Cede's aggregate votes on behalf of other investors. Permitting the investor to do so would authorize a non-dissenter to pursue dissenter's rights by "hijack[ing] the ownership rights" of other investors who happened to hold through the same nominee. *Sutter Opportunity Fund 2 LLC v. Cede & Co.*, 838 A.2d 1123, 1129 (Del. Ch. 2003). Nothing in the Appraisal Arbitrage Decisions speaks to that factual scenario.

In my view, the Appraisal Arbitrage Decisions address a situation in which there is an absence of proof. In each of those cases, no evidence was available to show how Cede voted the particular shares for which appraisal was sought, and the record suggested that no one who held shares in street name would be able to satisfy Section 262(a) if it required establishing how Cede voted specific shares.

It does not necessarily follow that just because in some cases there is no evidence regarding how Cede voted, then in other cases where it does exist the parties cannot introduce it and the court cannot consider it. Indeed, interpreting the Record Holder

56

Requirement in that fashion would run contrary to the core policies that led to its adoption. *See Salt Dome Oil Corp. v. Schenck*, 41 A.2d 583 (Del. 1945). In *Olivetti II*, the Delaware Supreme Court quoted the following passage from *Salt Dome*, the case in which the high court imposed the Record Holder Requirement (which was later codified) as a matter of common law:

> With respect to matters intracorporate affecting the internal economy of the corporation, or involving a change in the relationship which the members bear to the corporation, there must be order and certainty, and a sure source of information, so that the corporation may know who its members are and with whom it must treat, and that the members may know, in a proper case, who their associates are. Especially is this true in a merger proceeding which is essentially an intracorporate affair. The merging corporations are entitled to know who the objecting stockholders are so that the amount of money to be paid to them may be provided. The stockholders in general are entitled to know the dissentients and the extent of the dissent. The corporation ought not to be involved in possible misunderstandings or clashes of opinion between the non-registered and registered holder of shares. It may rightfully look to the corporate books as the sole evidence of membership.

*Olivetti II*, 217 A.2d at 685-86 (quoting *Salt Dome*, 41 A.2d at 588-89). But if the Record Holder Requirement prevents the parties and the court from looking beyond Cede's aggregate voting totals, then neither can know "the dissentients and the extent of the dissent." In lieu of "order and certainty, and a sure source of information," the voting process is hidden behind a depository veil of ignorance.

The solution, in my view, is to emulate the *Reynolds II* court and give "recognition of the realities of modern stock practices." 190 A.2d at 756. For present purposes, the "realities of modern stock practices" encompass a first-level transfer of voting authority from Cede to the DTC participants through the omnibus proxy, a second-level transfer of

voting authority from the DTC participants to Broadridge through powers of attorney, and a third-level role for Broadridge in collecting voting instructions *and carrying them out* by voting Cede's shares through the Broadridge Client Proxies. By using Broadridge's internal control numbers and other voting authentication materials, it is possible to determine how Cede voted particular blocks of shares.

In my view, the fact that Cede outsourced these parts of the voting process does not mean an iron curtain has descended to isolate the resulting evidence from the legal system. It simply means that the litigants must obtain the information from Broadridge, and they readily can.

The evidence showing how Cede voted particular blocks of shares provides a basis for distinguishing the Appraisal Arbitrage Decisions. Under those opinions, an appraisal petitioner that held in street name can establish a *prima facie* case that the Dissenter Requirement was met by showing that there were sufficient shares at Cede that were not voted in favor of the merger to cover the appraisal class. This showing satisfies the petitioner's initial burden and enables the case to proceed. If there is no other evidence, then as in the Appraisal Arbitrage Decisions, the *prima facie* showing is dispositive.

The analysis, however, need not stop there. Once the appraisal petitioner has made out a *prima facie* case, the burden shifts to the corporation to show that Cede actually voted the shares for which the petitioner seeks appraisal in favor of the merger. The corporation can do this by pointing to documents that are publicly available, such as a Form N-PX. Or the corporation can introduce evidence from Broadridge, ISS, and other providers of voting services, such as internal control numbers and voting authentication

records. If the evidence that the corporation adduces is not sufficient to demonstrate that Cede actually voted the shares for which the petitioner seeks appraisal in favor of the merger, then the petitioner can continue to maintain an appraisal action. But if the corporation demonstrates that Cede actually voted the shares for which the petitioner seeks appraisal in favor of the merger, then the Dissenter Requirement is no longer met, and the petitioner cannot obtain seek appraisal for those shares.

### 5. Statutory Limitations On What Inspectors Of Elections Can Consider

Perhaps recognizing that the Appraisal Arbitrage Decisions can be distinguished on the basis that they did not address a situation in which the record showed how Cede had voted the shares for which appraisal was sought, the T. Rowe Petitioners advance a statutory fallback argument to foreclose consideration of the dispositive evidence. They observe that under Section 231 of the DGCL, inspectors of election cannot consider evidence such as voting instructions when counting votes at a meeting of stockholders. *See* 8 *Del. C.* § 231. They further point out that the documents available at the September Meeting, including the Broadridge Client Proxies, did not identify how Cede voted particular shares.

Although the T. Rowe Petitioners have described accurately what inspectors of election can consider, the same limitations do not necessarily apply in a judicial proceeding. Delaware case law limits the court to considering what inspectors of election could consider when the question at issue is whether the inspectors did their job correctly. *See Williams v. Sterling Oil of Okla., Inc.,* 273 A.2d 264, 265 (Del. 1971); *Mainiero v.*

*Microbyx Corp.*, 699 A.2d 320, 323 (Del. Ch. 1996). The court is not so limited when addressing other issues that may touch on the validity or outcome of an election or how shares were voted.[13]

Equally important, Section 231 does not speak to appraisal rights, which are governed by Section 262. When interpreting distinct statutory provisions, Delaware

---

[13] *See* 8 *Del. C.* § 225 (directing court to determine validity of any contested election); *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 388-90 (Del. 2010) (analyzing whether vote buying occurred in corporate election); *Len v. Fuller*, 1997 WL 305833, at *4 (Del. Ch. May 30, 1997) (Allen, C.) (analyzing judicial enforcement of equitable rights in the voting context and looking at contractual relationship between beneficial holder and record holder, trial testimony, and economic factors to resolve voting dispute); *Testa v. Jarvis*, 1994 WL 30517, at *6 n.9 (Del. Ch. Jan. 12, 1994) (Allen, C.) ("Notwithstanding the corporation's proper reliance on its ledgers, as between a record owner and a transferee of shares, or a record owner and a beneficial owner, Delaware courts have often looked beyond the stock ledger to determine shareholder status, particularly with regard to voting rights."); *In re Giant Portland Cement Co.*, 21 A.2d 697, 702 (Del. Ch. 1941) (explaining that the court has authority to "reject votes cast by the record owners" because of "inequitable circumstances" and considering the beneficial owners' true "wishes"); *In re Canal Constr. Co.*, 182 A. 545, 548-49 (Del. 1936) (Wolcott, J., C.) (declining to count votes cast by registered owner when the beneficial owner had indicated a desire to have the stock voted differently); *Italo Petroleum Corp. of Am. v. Producers' Oil Corp. of Am.*, 174 A. 276, 278-280 (Del. Ch. 1934) (Wolcott, J., C.) (looking beyond corporate records and holding that beneficial holder "should be regarded as a stockholder of record" on facts presented). Similarly this court has the power to recognize and enforce the equitable right of a subsequent owner to vote shares, even though an inspector of elections would be forced to recognize the legal right of the prior owner. *See Commonwealth Assocs. v. Providence Health Care, Inc.*, 641 A.2d 155, 158 (Del. Ch. 1993) (Allen, C.) (explaining presumption under Delaware law that "upon request the seller will, in good faith, take such ministerial steps as are necessary (e.g., granting proxies) to effectuate the transfer [of voting rights to a post-record date buyer]"); *Fuller*, 1997 WL 305833, at *5 (barring record holder from voting shares by written consent after corporation exercised option to acquire shares); *Freeman v. Fabiniak*, 1985 WL 11583, at *7 (Del. Ch. Aug. 15, 1985) ("[I]t would be inequitable to allow a holder of record who holds mere legal title to stock to act by consent in a manner contrary to the wishes of the true owner.").

corporate law generally adheres to the "bedrock doctrine of independent legal significance," under which an outcome under one statutory section does not necessary govern the result under a different statutory section.[14] Once again, the statutory limitation on what inspectors of election can consider need not extend to appraisal rights.

Nor is the DGCL the only Delaware statute that governs this area. Cede is a securities intermediary for purposes of Article 8 of the Uniform Commercial Code. *See* 6 *Del. C.* § 8-102(a)(14)(i). Cede's participant banks and brokers are likewise securities intermediaries. *See id.* § 8-102(a)(14)(ii). A street-name investor that corporate law calls a beneficial holder is technically an entitlement holder, defined under Delaware's version of Article 8 as a "person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary." *Id.* § 8-102(a)(7). Cede and other securities intermediaries in the ownership chain have a statutory duty to exercise voting rights as instructed by the entitlement holder. *See id.* § 8-506. This statutory framework brings the beneficial holder into the picture and reinforces the viability of considering how Cede actually voted particular shares.

Under the Appraisal Arbitrage Decisions, the aggregate totals showing how Cede voted are sufficient to establish a *prima facie* case that the Dissenter Requirement is satisfied. But *Reynolds II* and *Olivetti II* indicate that a corporation can obtain and

---

[14] *Warner Commc'ns Inc. v. Chris–Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989) (Allen, C.) (applying doctrine), *aff'd*, 567 A.2d 419 (Del. 1989) (TABLE). *See generally* C. Stephen Bigler & Blake Rohrbacher, *Form or Substance? The Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law. 1 (2007).

introduce evidence to rebut that showing and demonstrate that Cede actually voted the shares for which appraisal was sought. The fact that an inspector of election could not consider that information under Section 231 does not mean that this court cannot examine it in the context of an appraisal proceeding.

**E.       The T. Rowe Petitioners Do Not Have Appraisal Rights.**

In this case, Cede exercised its voting rights by granting an omnibus proxy to its participants that authorized them to vote Cede's shares. State Street was one of those participants. State Street in turn exercised the voting rights it received through the omnibus proxy in accordance with instructions specified by its clients, including the T. Rowe Petitioners. State Street did not obtain or execute those voting instructions itself. State Street contracted with Broadridge to carry out those tasks and gave Broadridge a power of attorney that empowered Broadridge to execute proxies on State Street's behalf.

Meanwhile, the T. Rowe Petitioners contracted with ISS to collect and submit their voting instructions to Broadridge. In this case, the T. Rowe Voting System provided instructions to ISS to vote in favor of the Merger. ISS conveyed those instructions to Broadridge, and Broadridge carried them out by executing the Broadridge Client Proxies. Through this daisy chain, Cede voted the shares for which the T. Rowe Petitioners seek appraisal in favor of the Merger.

Broadridge's records make this clear. For the T. Rowe Petitioners that were mutual funds, so do their disclosures on Form N-PX.

It simply is not true that it is impossible to determine how Cede voted the shares over which the T. Rowe Petitioners exercised voting authority. When questions arose

about how the shares were voted, T. Rowe, ISS, and Broadridge all acted as if they could identify the shares and how they were voted, and they came to the conclusion that Broadridge voted the shares "FOR" the Merger. The linkage to specific shares also appears in the form of demand that Cede delivered on behalf of the T. Rowe Petitioners, in which Cede stated that it was acting on behalf of its participating member and the member's customer as to a specifically identified block of shares that the customer beneficially owned.

The T. Rowe Petitioners made out a *prima facie* case sufficient to satisfy the Dissenter Requirement, but discovery has shown that Cede, the stockholder of record, actually voted the shares of stock for which appraisal was sought in favor of the Merger. The Dissenter Requirement was not met. The T. Rowe Petitioners therefore do not have appraisal rights.

## F.     The T. Rowe Petitioners' Other Arguments

To avoid the implications of the Dissenter Requirement, the T. Rowe Petitioners seek to shift the focus elsewhere, away from the voting instructions that the T. Rowe Voting System submitted to ISS, which ISS provided to Broadridge, and which Broadridge carried out. First, the T. Rowe Petitioners argue that they submitted the voting instructions mistakenly, which they did, and that they should not lose their appraisal rights because of an inadvertent error. Second, they point to language in the Proxy Statement which they interpret as saying that earlier votes would remain effective, and they argue that Dell should be estopped from treating Broadridge's later votes in favor of the Merger as Cede's actual votes. Third, they argue that because of the ruling that this

court reached in the *Dell Ownership* decision, the voting instructions that they provided should not matter. None of these arguments carries the day.

### 1. ISS

The T. Rowe Petitioners contend that although they submitted voting instructions against the Merger, they did so inadvertently because of ISS and should not lose their appraisal rights as a result. When an investor elects to use intermediaries, the investor assumes the risk that the intermediaries will err or otherwise fail to act in accordance with the investor's wishes.[15] That general rule applies to the appraisal statute.[16] Ironically, by

---

[15] *See, e.g.*, *Preston v. Allison*, 650 A.2d 646, 649 (Del. 1994) ("If a beneficial stockholder is disenfranchised because of the record stockholder's failure to follow instructions, no relief is afforded in the usual case. . . . Implicit in [that rule] is the recognition that [the beneficial holder] was free to choose its method of voting and the person in whom it would entrust that responsibility. As a result, a careless mistake by [the person selected] was not allowed to overturn and delay the election results."); *Am. Hardware Corp. v. Savage Arms Corp.*, 136 A.2d 690, 692 (Del. 1957) ("If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement . . . ."); *Scott v. Arden Farms Co.*, 28 A.2d 81, 84 (Del. Ch. 1942) (holding that where trustees had voted shares in voting trust for a merger, trust certificate holders were "manifestly bound by the acts of the voting trustees, done in good faith and within the scope of their authority, in carrying out purposes of the trust").

[16] *See, e.g.*, *Enstar Corp. v. Senouf*, 535 A.2d 1351, 1354-55 (Del. 1987) (disqualifying shares from appraisal remedy where broker failed to deliver demand signed by or on behalf of stockholder of record); *Salt Dome Oil Corp. v. Schenck*, 41 A.2d 583, 589 (Del. 1945) ("If, for any reason, [an investor] chooses to allow his shares to be registered on the corporate books in the name of another, it is not a denial of his right of actual ownership to require him to establish his rights and pursue his remedy through the nominee of his own selection."); *see also Dirienzo v. Steel P'rs Hldgs., L.P.*, 2009 WL 4652944, at *4 (Del. Ch. Dec. 8, 2009) (collecting cases and noting that "Delaware courts have held appraisal demands to be invalid where they were made by a beneficial owner *even in instances where the identity of the record holder was known* by the respondent corporation").

making this argument, the T. Rowe Petitioners are effectively contending that Broadridge acted without actual authority (albeit with apparent authority) because of the mistaken conveyance of voting instructions by ISS. Both *Reynolds II* and *Olivetti II* prohibit any inquiry into whether the beneficial holder authorized the actions taken by the record holder. The actions that the record holder took are dispositive.

In the *Dell Ownership* decision, I argued for modifying this principle for purposes of actions taken at the depository level, because that level of ownership resulted from federal policy and not investor choice. *See* 2015 WL 4313206, at *11. Under my modified approach, which I did not actually apply and which the Delaware Supreme Court may choose not to adopt, a mistake that resulted from interactions between DTC and its participants would not lead to the automatic forfeiture of appraisal rights. *See id.* at *24; *cf. Preston*, 650 A.2d at 649 (declining to impose consequences of mistake by record holder on plan participants who were required by law to hold through the plan). To implement my modified approach, I suggested treating the DTC participants (in this case State Street) as the record holders for purposes of Delaware law, just as they are record holders for purposes of federal law and just as they were record holders under Delaware law before the federal depository intervention.

Neither suggestion would change in the outcome here. The mistake in this case did not arise at the DTC level as a consequence of the federal policy of share immobilization. It arose because T. Rowe has to vote in a large number of corporate elections and wanted to rely on ISS to ease that burden. By choosing to rely on ISS to transmit its voting

instructions, T. Rowe accepted the risk that ISS might transmit voting instructions inconsistent with T. Rowe's true intentions.

Nor would the mistake disappear if the court treated State Street as the record holder. Through the power of attorney in its services agreement with Broadridge, State Street granted Broadridge authority to vote its shares in accordance with instructions received from the beneficial holders. In this case, the T. Rowe Voting System communicated instructions to ISS, which communicated them to Broadridge, which carried them out. For purposes of this case, the outcome remains the same if the analysis were to focus on State Street rather than on Cede.

### 2. Dell's Proxy Statement

Alternatively, the T. Rowe Petitioners contend that they should not be bound by the instructions that were submitted for the September Meeting because they previously gave ISS instructions to vote "AGAINST" the Merger in connection with the July Meeting. They cite the Proxy Statement for the September Meeting, which they say promised that earlier voting instructions would remain in effect. The language in question reads as follows:

> If you have already voted by proxy in favor of the proposals contained on the proxy card using a properly executed WHITE proxy card or otherwise voted by proxy in favor of such proposals over the Internet or by telephone, you will be considered to have voted in favor of such proposals and do not need to take any action, unless you wish to revoke or change your proxy. If you have already voted by proxy against the proposals contained on the proxy card, you will be considered to have voted against such proposals and do not need to take any action, unless you wish to revoke or change your proxy.

JX 651 at 4 (emphasis removed). T. Rowe says it took comfort in this language, which it interprets as a representation that if a stockholder previously submitted instructions to vote against the Merger in connection with the July Meeting, then its shares would be "considered to have voted against" the Merger for the September Meeting.

The T. Rowe Petitioners read the language of the Proxy Statement too broadly. The language effectively said that a proxy would remain in effect unless changed. It did not say that votes from the July Meeting would remain in effect if an authorized agent delivered a later and inconsistent proxy card. To the contrary, under operative principles of law, a later proxy card displaces an earlier and inconsistent card.[17] Consistent with this rule, language appearing later in the same paragraph of the Proxy Statement advised investors that this was the method they should use to change their votes: "If you have not previously voted by proxy or if you wish to revoke or change your proxy, please vote by proxy over the Internet or by telephone, or complete, date, sign and return you WHITE proxy card as soon as possible." JX 651 at 4 (emphasis removed).

Whether T. Rowe intended to change its voting instructions or not, T. Rowe's authorized agent (ISS) in fact changed the voting instructions for the T. Rowe Petitioner's

_____

[17] *See, e.g.*, *Standard Power & Light Corp. v. Inv. Assocs.*, 51 A.2d 572, 580 (Del. 1947) ("[W]hen two proxies are offered bearing the same name, then the proxy that appears from the evidence to have been last executed will be accepted and counted under the theory that the latter—that is, more recent—proxy constitutes a revocation of the former."); *Parshalle v. Roy*, 567 A.2d 19, 23 (Del. Ch. 1989) ("Faced with two identical proxies having differing dates, the Inspectors correctly gave effect to the later-dated proxy—a result mandated . . . by Delaware case law . . . .").

shares. Broadridge then revoked the client proxies it submitted for the July Meeting by issuing entirely new client proxies for the September Meeting. The later client proxies not only voted the shares held at Cede for which the T. Rowe Petitioners now seek appraisal, but voted them in favor of the Merger. The language in the Proxy Statement places no limitation on the effectiveness of a later and inconsistent proxy.

### 3. The *Dell Ownership* Decision

The T. Rowe Petitioners last contend that even if proof regarding how Cede actually voted might carry the day in another case, it cannot do so here because the *Dell Ownership* decision is law of the case. That decision held that certain other petitioners affiliated with T. Rowe lost their appraisal rights because they failed to satisfy the continuous ownership requirement imposed by Section 262(a) when their custodial banks had Dell's transfer agent re-issue and re-title shares previously held in the name of Cede in the names of their own nominees. *See Dell Ownership*, 2015 WL 4313206, at *2-3. The T. Rowe Petitioners read the *Dell Ownership* decision as recognizing that a court cannot look beyond the formal record holder, and they believe that this rule forecloses a court from examining any evidence beyond Cede's aggregate voting totals.

Accepting that the *Dell Ownership* decision is law of the case (albeit only for purposes of proceedings at this level of the judicial system), there is no inconsistency. Both that ruling and this one focus on the actions of the record holder. In the *Dell Ownership* decision, the record holder changed from Cede to other nominees, thereby contravening the continuous holder requirement. *See* 8 *Del. C.* § 262(a). In this decision, the record holder in fact voted the particular shares for which the T. Rowe Petitioners are

pursuing an appraisal in favor of the Merger. The critical evidence that reveals how the record holder voted its shares comes from parties other than the record holder, but the dispositive analysis operates at the record holder level. Because the record holder voted those shares in favor of the Merger, the record holder cannot satisfy the Dissenter Requirement, and the T. Rowe Petitioners cannot pursue an appraisal for those shares. In both cases, the actions of the record holder control the outcome under the appraisal statute.

## G.     The Proposal To Substitute Cede As Petitioner

The T. Rowe Petitioners creatively propose to amend their petitions to substitute Cede as the petitioner. That would not matter. Cede cannot obtain appraisal of shares it voted in favor of the Merger. No one can seek appraisal for those shares.

## III.     CONCLUSION

The T. Rowe Petitioners cannot pursue an appraisal of shares that Cede, as record holder, voted in favor of the Merger. They do not possess appraisal rights, and judgment is entered against them. They remain entitled to the merger consideration without any award of interest.